Richard J. SARGENT, et al., Plaintiffs-Appellants,

v.

GENESCO, INC., et al., Defendants-Appellees.

No. 72–3055.

United States Court of Appeals, Fifth Circuit.

April 11, 1974.

Rehearing Denied May 9, 30, 1974.

R. Alan Stotsenburg, New York City, Guy B. Bailey, Jr., John P. A. Bell, Miami, Fla., for plaintiffs-appellants.

Charles F. Clark, Ted R. Manry, III of Macfarlane, Ferguson, Allison & Kelly, Tampa,Fla., for Goodbody & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Walston & Co., Inc., Ladd Dinkins & Co., First Alabama Securities, Inc., Kohlmeyer & Co., McCarley & Co., Inc., Powell Kistler & Co., Powell, Kistler & Crawford, Roberts Scott & Co.

Leonard W. Cooperman, St. Petersburg, Fla., for Leeds Shoes, Inc.

A. Dallas Albritton, Jr., Tampa, Fla., William A. Richter, St. Louis, Mo., for A. G. Edwards & Sons, Inc.

David A. Maney, Tampa. Fla., for Jack Chapman, Julian Lemus, Stuart S. Golding and Roy Cotarelo.

William T. Keen, Tampa, Fla., for Wachovia Bank & Trust.

John T. Allen, Jr., St. Petersburg, Fla., William V. Gruman, Tampa, Fla., for Ralph A. Buchman and Partnership of Buchman, Endsley & McCormick.

Theodore C. Taub, Tampa, Fla., for Richard Lieb.

Donovan Leisure Newton & Irvine (Sanford M. Litvack, of counsel), New York City, and Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (Wm. Reece Smith and James W. Ault, of counsel), Tampa, Fla., for Genesco, Inc., Genesco Financial Corp., Ernest B. Holt, Richard E. Horch and William B. Curran.

Daniel N. Burton, Tampa, Fla., for William Burton and Earl Brown.

Douglas J. Loeffler, Fox, Burton, George & Loeffler, Clearwater, Fla., for Clayton D. Burton.

Trennam, Simmons, Kenker, Scharf & Barkin, Tampa, Fla. (Marvin E. Barkin, Tampa, Fla., of counsel), for William H Martin.

Before THORNBERRY, DYER and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The right to maintain a private action for damages under sections 10(b), 14(a) and 14(e) of the Securities Exchange Act of 1934 (Exchange Act),[1] is the most important issue raised by this appeal from a final judgment dismissing on the pleadings all plaintiffs' claims for damages against all defendants save one.[2] The propriety of the district court's denial of preliminary injunctive relief must also be considered. We affirm in part and reverse in part.

As is normal to appeals at the pleading stage, the factual background is skeletal, and the principal source of the following recital is taken from the record developed in connection with the motion for injunctive relief. Leeds Shoes, Inc. (Leeds) is a Florida corporation engaged in the retail sale of shoes and related items, which has its principal office in Tampa. Leeds is the corporate successor to a partnership created by Frank Garcia and another individual. From Leeds' inception until December 1967, Garcia apparently was its driving force as president of the company, major common stockholder, and a member of the Board of Directors. Leeds became publicly owned in 1963, although Garcia continued to hold approximately 26% of the outstanding common stock through at least August 1967. At the fiscal year end April 30, 1967, Leeds' fi-

---

1. The 1934 Act is contained in 15 U.S.C. at § 78a et seq; Section 10(b) is 15 U.S.C. § 78j; Section 14(a) is 15 U.S.C. § 78n(a); and Section 14(e) is 15 U.S.C. § 78n(e).

2. Frank Garcia answered the complaint and did not move to dismiss.

nancial prospects on paper appeared optimistic. In August 1967, ostensibly to provide more working capital, Leeds issued and sold to the public 1.5 million dollars in convertible 6% subordinated debentures due August 1, 1987. This offering was registered under the Securities Act of 1933 and pursuant to that Act a registration statement and prospectus were filed with the Securities Exchange Commission (SEC). Later in 1967 it became apparent that the glamour of Leeds' financial reports was cosmetic. Leeds' audited financial statements for the fiscal years ended April 30, 1966 and 1967 contained overstatements of such items as cash, inventories, fixed assets, total assets, retained earnings, and earnings per common share. These overstatements were repeated in the prospectus published for the August 1967 registered sale of debentures. Additionally, Leeds' annual reports to shareholders, SEC filings and press releases apparently contained misstatements. On December 12, 1967 the SEC suspended trading in Leeds' securities pending clarification of Leeds' financial condition. Subsequently, Garcia pleaded guilty to an indictment charging him with wilful misstatements in the debenture prospectus and resigned his positions as officer and director of Leeds, and two individual members of the accounting firm serving as Leeds' auditors pleaded guilty to wilful obstruction of justice and of an SEC investigation by burning important records and ledgers relevant to the company's financial condition for the five year period ending April 30, 1967.

After it became apparent that the August 1967 debenture prospectus contained substantial material misstatements of Leeds' financial condition, Leeds' management, the underwriters who participated in the debenture offering, Genesco (Leeds' principal supplier of shoes and only preferred shareholder), and Prudential Insurance Company of America (the major creditor of Leeds[3]) agreed upon a "refinancing plan".[4] In summary, this plan involved the following steps: (1) an increase in the conversion value of the debentures by Leeds;[5] (2) an agreement to purchase more preferred shares by Genesco; (3) a two year moratorium on annual principal payments for its outstanding loan and a commitment to loan more money by Prudential; (4) a commitment by the underwriters to purchase any of the outstanding debentures which were tendered and convert them to common stock at the reduced conversion rate; (5) the release, waiver, and assignment by selling debenture holders of all claims against Leeds and its directors and officers other than Garcia; and (6) a purchase of an amount of authorized but unissued Leeds' common stock by A. G. Edwards & Sons, Inc., one of the underwriters. The plan obligations of Genesco, Prudential, A. G. Edwards and the other underwriters were contingent upon acceptance of the plan (by sale or conversion) of 80% of the debenture holders. Debenture conversion was to be into authorized but unissued Leeds' common shares at the increased rate. Conversion did not release, waive or assign any claim, but debenture holders were warned that such conversion could have adverse effects on any claims they had.

On September 18, 1968 a letter was mailed to Leeds' shareholders and debenture holders briefly explaining the catas-

---

3. Prudential held notes in the principal amount of 1,350,000 dollars at 6 to 6½% interest.

4. Obviously it was felt that some if not all of the plan's participants (i. e.. Leeds, the underwriters and certain of Leeds' management) would have been subject to Securities Act suits by the debenture holders because of misstatements in the registration statement and prospectus.

5. The conversion price of Leeds' common stock was reduced from $16.59 per share through August 1, 1973, $18.30 per share from August 2, 1973 through August 1, 1979 and $20.25 per share thereafter, to $3.33⅓ per share from September 2, 1968 through March 1, 1969, $7.50 per share from March 2, 1969 through August 1, 1973, and $10.00 per share thereafter until the maturity of the debentures.

trophic events which had befallen the company, outlining its financial condition and summarizing the terms of the refinancing plan. The letter also stated that, if full effectuation of the plan occurred, the book value of Leeds' common stock would ultimately be increased—the company would obtain needed working capital; and it would be helped in avoiding potential defaults on its existing indebtedness. The tenor of the letter is informational, and it does not expressly call for the common shareholders to vote on the plan. Although the letter mentions that certain of Leeds' SEC filings and the debenture prospectus appear to be "inaccurate," it does not specifically describe any potential liabilities incurred as a result of the debenture offering.[6] At the date of the letter's mailing, the 1968 annual stockholders meeting, required by Leeds' bylaws to be held on September 14 of each year, had not been held, and no such meeting was held until August, 1969. The requisite number of debenture holders accepted the plan. Shortly after the September 18 letter was mailed, the SEC resumed trading in Leeds' securities, and the refinancing plan became a reality. Leeds continues to be an operating company, although the selling price of its stock is well below pre-1968 levels.

This action originally was brought in the Southern District of New York in May 1970. In April 1971 it was transferred to the Middle District of Florida[7] and in October 1971 the plaintiffs filed their second amended complaint, an extensive document, the sufficiency of which is the major subject of this appeal. The individual named plaintiffs are nine common shareholders of Leeds. They sue for themselves and on behalf of a class consisting of the "beneficial owners of Leeds' common stock at the close of business on December 12, 1967." They seek damages both individually, and derivatively on behalf of Leeds, for alleged past Exchange Act violations and mandatory and prohibitive injunctive relief to rectify certain continuing practices of Leeds' management. Damages are alleged to be 20,000,000 dollars. The defendants are Genesco, Inc. and Genesco Financial, Inc.;[8] the underwriters involved in the debenture offering and the refinancing plan;[9] past and present directors and officers of Leeds;[10] and members of the accounting firm of Buchman, Endsley and McCormick which "acted as Leeds' independent accountants at the time of the acts in question." The second amended complaint contains four counts. Count I alleges various misstatements as to Leeds' financial condition published in Leeds' annual report, financial statements, the debenture prospectus, SEC filings, and the financial

---

6. It does state:
 Rights and liabilities with respect to the Debentures under the Federal securities laws or otherwise are discussed in the offering Underwriters' offer and Debenture holders are referred to the offer as to such rights and liabilities.
 The offer referred to was distributed only to debenture holders.

7. There is some dispute between the parties as to the basis of this transfer. *See*, The Statute of Limitations at p. 758, *infra*.

8. Genesco Financial, Inc. owns all of Leeds' preferred stock and is a wholly owned subsidiary of Genesco, Inc. Genesco is alleged to be a controlling person of Leeds.

9. These underwriters are Goodbody & Co., Walston & Co., Inc., A. G. Edwards & Sons, Lad Dinkins & Company, First Alabama Securities, Inc., Kohlmeyer & Co., McCarley & Company, Inc., Powell, Kistler & Co., and Roberts, Scott & Co., Inc.

10. These defendants are: Frank Garcia, Director 1955–June 1968;
 Jack Chapman, Director 1961 to present, Officer 1961 to present;
 Julian Lemus, Director 1961 to present, Officer 1961 to present;
 Roy Cotarelo, Director 1962–1969;
 Stuart S. Golding, Director 1964–1969;
 Richard Lieb, Director 1964–1969;
 Ernest B. Holt, Jr., Director 1961 to present;
 Earl D. Brown, Director 1969 to present;
 C. Edward Britton, Director 1968–1971, Officer 1968–1971;
 Clayton B. Burton, Director 1969 to present;
 William M. Burton, Director 1969 to present;
 Richard E. Horch, Director 1969 to present;
 William H. Martin, Director 1968 to present, Officer 1968–1969;
 William B. Curran, Director 1970 to present.

media. It seeks direct relief in the form of damages. Count II complains generally of the 1968 "refinancing plan", but its major thrust is directed at alleged misstatements and omissions in the September 18, 1968 letter to Leeds' security holders. The relief sought in Count II is both direct and derivative in nature. Count III seeks mandatory and prohibitive injunctive relief against Leeds' present management based upon asserted continuing violations of the securities laws. Count IV is framed as a state claim based on pendent jurisdiction seeking damages for the same activities as Count I.

After hearing evidence on plaintiffs' motion for a preliminary injunction, the district court found that the requisite probability of success on the merits and threatened irreparable harm were lacking and denied preliminary relief under Count III.[11] In the same opinion the court granted the motions to dismiss the remainder of the complaint filed by all defendants but Garcia. Counts I and II were apparently dismissed under Fed.R. Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. With these counts out of the way, the district court concluded that Count III by itself could not support permanent injunctive relief and dismissed that count also. Count IV was dismissed for plaintiffs' failure to post a bond required by state law.[12] The dismissal of Count I, portions of Count II, and Count III was initially without prejudice and with leave to amend and plead in accordance with the requirements set forth in the district court's order of dismissal. No amendment having been made, the court directed the entry of final judgment as to all counts in favor of all defendants but Garcia, pursuant to Fed.R. Civ.P. 54(b). The plaintiffs bring this appeal from the final judgment on Counts I, II, and III and from the dis-trict court's failure to grant a preliminary injunction.[13]

## COUNT I

Count I is based on section 10b of the Exchange Act and rule 10b–5, 17 C.F.R. § 240.10b–5. This count alleges that during 1966 and 1967 the defendant officers and directors of Leeds "unlawfully, willfully and knowingly or having reason to know" published or caused to be published untrue statements about the financial condition of Leeds for the fiscal year ending April 30, 1967, which misstatements included gross overstatement of earnings and assets. It alleges that Leeds' accountants "knew or had reason to know of the false statements and omissions." Similarly, it asserts that the defendants claimed to be controlling persons of Leeds "knew or had reason to know of the false statements and induced them in bad faith"; and that the defendant underwriters "knew or had reason to know by reason of their confidential relationship to Leeds of the false statements and omissions", but nevertheless consented to republication of the false information. Finally, Count I sets out that plaintiffs relied upon these false statements and omissions in purchasing Leeds' stock in 1967 and "purchased such stock in a market artificially inflated by the false statements and omissions."

Considering privity, i. e., a direct purchaser-seller relationship between plaintiffs and defendants to be an essential allegation which plaintiffs would not or could not allege, the district court dismissed Count I. On this appeal all defendants urge not only that the privity requirement was correctly applied below but that the district court erred in ruling that the cause of action was not barred by the statute of limitations. The defendant "underwriters" additionally argue that the complaint was prop-

---

11. The court had considered earlier several motions by the plaintiffs for "emergency" injunctive relief but had denied such relief. A discussion of these motions is not relevant to this appeal.

12. Plaintiffs do not appeal the district court's dismissal of Count IV.

13. The denial of preliminary injunctive relief is appealable pursuant to 28 U.S.C. § 1292 (a)(1).

**758**

erly dismissed as to them, because its allegations, are insufficient to support the elements of scienter and causation required by 10b–5.

## THE STATUTE OF LIMITATIONS

■ The federal securities laws contain no limitation period that is expressly applicable to claims under section 10(b) and rule 10b–5, nor does federal law prescribe any general statute of limitations for civil actions. Consequently, the limitation period which the forum state applies to the state remedy which bears the closest substantive resemblance to rule 10b–5 and which best effectuates its purpose is to be applied. *See e. g.,* Azalea Meats v. Muscat, 386 F.2d 5 (5th Cir. 1967); Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir.), cert. denied 400 U.S. 852, 91 S.Ct. 47, 27 L. Ed.2d 90 (1970); and International Union, United Auto., etc., Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S. Ct. 1107, 16 L.Ed.2d 192 (1966). However, the date when a claim accrues so as to trigger the state law limitation period is a matter of federal law, and our court-fashioned rule is that a 10b–5 claim accrues when the plaintiff actually discovers the alleged fraud. *See, e. g.,* Hooper v. Mountain States Securities Corp., 282 F.2d 195, 200 (5th Cir.) cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L. Ed.2d 693 (1960); and Azalea Meats v. Muscat, *supra,* 386 F.2d at 8.

The defendants argue that notwithstanding this court's decision in Azalea Meats v. Muscat, *supra,* which applied Florida's three year limitation period for common law fraud to a 10b–5 action, the limitation period that should be applied is the two-year statute applicable to the Florida blue sky laws, Fla.Stat. § 517.21, F.S.A. They assert that the plaintiffs' discovery of the alleged fraudulent misstatements could have oc-

curred no later than December 12, 1967 when the SEC suspended trading in Leeds' stock and, since this action was originally filed on May 4, 1970, it is barred under the two-year blue sky limitation period. To support this position that the blue sky limitation period is applicable, defendants rely mainly on Vanderboom v. Sexton, *supra,* and Parrent v. Midwest Rug Mills, 455 F.2d 123 (7th Cir. 1972); [14] *but see, e. g.,* Charney v. Thomas, 372 F.2d 97 (6th Cir. 1967). Our resolution of a preliminary issue makes it unnecessary to decide this question.

This suit was originally filed in the Southern District of New York and transferred to the Middle District of Florida. If there had been no transfer to Florida, the six year statute of limitations held applicable to New York forum 10b–5 suits would have applied, Klein v. Auchincloss, Parker & Redpath, 436 F.2d 339 (2d Cir. 1971), and Count I, of course, would not be barred. The defendants moved to transfer this case under 28 U.S.C. § 1404(a) [15] and in transferring the case, the New York district judge noted that he was doing so on the basis of 1404(a). Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) holds that when a case is transferred under Section 1404(a), such a transfer should be merely a "change of courtrooms", and the transferee forum must apply the state law which would have been applied by the transferor court. Under this principle, the case brought New York's six year statute to Florida.

■ Some of the defendants, however, seek to avoid this result by arguing that, as to them, venue in New York was improperly laid and as a result the transfer was necessarily a change to a proper venue pursuant to 28 U.S.C. §

14. Although not cited by defendants, Josef's of Palm Beach, Inc. v. Southern Investment Co., 349 F.Supp. 1057 (D.C.1972) applies Florida's two year blue sky limitation period to a 10b–5 claim instead of the three year common law fraud statute.

15. 28 U.S.C. § 1404(a) provides:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

1406(a) [16] to which *Van Dusen* does not apply. If we were to accept this argument, a Florida limitation period would be the appropriate one, Geehan v. Monahan, 382 F.2d 111 (7th Cir. 1967); and Dubin v. United States, 380 F.2d 813 (5th Cir. 1967). However, this argument founders upon twin reefs. First, the broad venue provision of the Exchange Act, 15 U.S.C. § 78aa, which provides for venue, among other places, in the district "wherein any act or transaction constituting the violation occurred." Second, at the pleadings stage the complaint controls, and here it alleges that "numerous acts or transactions constituting violations which are the basis of this complaint occurred in the Southern District of New York." Under 78aa venue is proper in any district where any act or transaction by *any* defendant in furtherance of an allegedly fraudulent scheme occurred. *See* Wyndham Associates v. Bintliff, 398 F.2d 614 (2d Cir.) cert. denied 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968); Texas Gulf Sulphur v. Ritter, 371 F.2d 145 (10th Cir. 1967); and Hooper v. Mountain States Securities Corp., *supra.* Given the propriety of New York venue, 1404(a) provides the only basis upon which this case could have been transferred to Florida. It brought the New York statute of limitations with it under *Van Dusen,* and the district court was correct in rejecting defendant's statute of limitations argument.

### PRIVITY

■ As recognized by the district court, there are three basic elements to be pled and proved in 10b–5 actions: (1) conduct by the defendants proscribed by the rule; (2) a purchase or sale of securities by the plaintiffs "in connection with" such proscribed conduct; [17] and (3) resultant damages to the plaintiffs. However, that court held that the requisite "connection" between a defendant's proscribed conduct and a plaintiff's securities transaction can only be supplied by privity. This idea springs from Joseph v. Farnsworth Radio and TV Corp., 99 F.Supp. 701 (S.D.N.Y.1951) aff'd 198 F.2d 883 (2d Cir. 1952). In *Joseph* the court noted in dismissing the plaintiff's complaint that "a semblance of privity between the vendor and purchaser of the security in connection with which the improper act, practice or course of business was invoked seems to be a requisite and it is entirely lacking here." 99 F.Supp. at 706. If *Joseph* ever stood for the proposition that an allegation of privity is a *sine qua non* of 10b–5 pleading, *see* Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951), it was first undermined, *see, e. g.,* Cochran v. Channing Corp., 211 F. Supp. 239 (S.D.N.Y.1962); and Brown v. Bullock, 194 F.Supp. 207, 229 (S.D.N.Y.) aff'd 294 F.2d 415 (2d Cir. 1961); and ultimately overruled by the Second Circuit both as to injunction actions brought by the SEC, *see* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); and private suits for damages *see* Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968) cert. denied 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). Similarly, other circuits have expressly declined to make an allegation of privity a precondition to a private action for damages. *See* Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 100 (10th Cir.) cert. denied 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), rehearing denied, 404 U.S. 1064, 92 S.Ct. 734, 30 L.Ed.2d 754 (1972); and Texas Continental Life Insurance Co. v. Bankers Bond Co., 307 F.2d 242, 249 (6th Cir. 1962).

In Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970) this court took note of the privity requirement by pointing out

16. 28 U.S.C. § 1406(a) provides:
 The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

17. See discussion under 10b–5 DIRECT CLAIM, *infra* at pp. 762–764.

that it had been at first "suggested" and then abandoned in the second circuit, but did not reach the issue. However, the court in *Herpich* did state that "Congress, when it used the quoted language [of 10(b)], did not intend necessarily to require a purchase or sale of securities by the alleged violator as a precondition to the establishment of a violation of the section and the rule. . . ." 430 F.2d at 806. No other cases in this circuit have expressly decided the privity issue. *See e. g.,* Kuehnert v. Texstar Corp., 412 F.2d 700, 702 (5th Cir. 1969). However, if the issuance of stock by the corporation represented derivatively by the plaintiff in Hooper v. Mountain States Securities Corp., *supra,* is interpreted as a sale to the corporation created by the defendants rather than to the individual defendants themselves, then this court ruled there *sub silentio* that privity is not required.

 Using the guidance of our note in *Herpich* and the policy behind section 10(b) and rule 10b–5, we hold that a 10b–5 plaintiff does not have to allege privity or any contemporaneous market trading by the plaintiff and defendant to state a claim for relief. Initially, we would observe that a rule requiring privity in all cases would be contrary to the quoted language from *Herpich*. Furthermore, there are sound policy reasons for rejecting an absolute requirement of privity. The basic intent of section 10(b) and rule 10b–5 and indeed, of the Exchange Act, is to protect investors and instill confidence in the securities markets by penalizing unfair dealings. "[A] corporation's misleading material statement may injure an investor irrespective of whether the corporation itself, or those individuals managing it, are contemporaneously buying or selling the stock of the corporation." SEC v. Texas Gulf Sulphur Co., *supra,* 401 F.2d at 861. Implementation of rule 10b–5 is dependent on private enforcement, and a requirement of privity in every instance would narrow the focus of section 10(b) and its implementing

rule from the broad protection of investors to the punishment of direct buyers or sellers whose acts violated the statute and rule. The rule would be rendered useless in situations like that alleged in the instant case in which the wrongful gain from plaintiffs' purchase was incidentally derived by someone other than the wrongdoer.

The defendants also argue that even if this court rejects privity as an absolute limitation, it should be applied on a case by case basis. In this they rely on Brown v. Bullock, *supra,* in which the court stated that "privity is not an ultimate or operative fact. It is an evidentiary fact to be considered in conjunction with other material facts," 194 F. Supp. at 230. *See also* Financial Industrial Fund v. McDonald Douglas Corp., CCH Fed.Sec.Law Rep. ¶ 93,004 (D.Col.1971); Cochran v. Channing Corp. *supra;* and VI Loss, Securities Regulation, 3895–96 (1969 Supp.). They urge that this is an appropriate case to require privity and call our attention to the fact that any judgment against Leeds in favor of the plaintiff shareholders may bankrupt the corporation at the expense of innocent common shareholders who purchased or converted into common after December 12, 1967, remaining debenture holders, and creditors. *See e. g.,* SEC v. Texas Gulf Sulphur, *supra,* 401 F.2d at 870 (Moore, J., dissenting).

 Assuming arguendo that such a rule may be adopted after a full hearing in this or another appropriate case, its application at the pleading stage would be inappropriate. We agree with the court's conclusion in Shapiro v. Merrill, Lynch, Pierce, Fenner and Smith, 353 F.Supp. 264, 274 (S.D.N.Y.1972): "It is clear, therefore, that a lack of privity between plaintiff and defendant is not sufficient to warrant dismissal of the complaint and that causation is an independent element capable of establishment notwithstanding such lack of privity. While privity *may* be an indication of the required 'connection' . . . it is certainly not determinative of such

requirement, and an absence of privity will not defeat an otherwise properly pleaded 10b–5 complaint."

█ Privity may be a factor in the establishment of a causal connection between the defendant's conduct which assertedly violates rule 10b–5 and the plaintiff's injury, and it may determine the availability to the plaintiff of a remedy such as recision or restitution, see Janigan v. Taylor, 344 F.2d 781 (1st Cir.) cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). However, the requisite causal connection can also be established by pleading and proving a nexus between plaintiff and defendant other than through privity.

█ In the instant case the plaintiffs have alleged actual reliance upon the defendants' assertedly fraudulent misstatements and omissions. They have also alleged that the effect of these misstatements and omissions was to inflate artifically the market in which plaintiffs purchased Leeds' stock. These pleadings are sufficient to withstand a 12(b)(6) motion.[18]

The district court's dismissal of Count I must be reversed.

### SCIENTER AND CAUSATION AS TO UNDERWRITERS

Since the only relationship of the underwriters to Count I rests upon their acting as brokers in selling Leeds' stock during the time that the alleged misstatements in Count I were published, they argue that a higher standard of scienter is required to hold them liable. They further argue that the complaint fails to state a sufficient causal relationship between their alleged misconduct and plaintiffs' injuries.

█ The second claim is clearly without merit. The allegation that the underwriters "consented" to the republishing of the false financial information and that the plaintiffs relied upon this is sufficient to plead causation. In support of their first argument the underwriters rely on Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2d Cir. 1971); Segal v. Gordon, 467 F.2d 602 (2d Cir. 1972); Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir. 1972); and Weber v. C.M.P. Corporation, 242 F.Supp. 321, 324 (S.D.N.Y. 1965). In *Shemtob* the court noted that "plaintiffs' claim is nothing more than a garden-variety customer's suit against a broker for breach of contract, which cannot be bootstrapped into an alleged violation of § 10(b) . . ., in the absence of allegation of facts amounting to scienter, intent to defraud, reckless disregard for the truth, or knowing use of a device scheme or artifice to defraud. It is insufficient to allege mere negligence." 448 F.2d at 445. Something more than ordinary negligence is required to hold anyone liable under rule 10b–5, *see e. g.,* Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290–1291 (2d Cir. 1969),[19] and a fortiori to hold a broker who acts only as broker. Nevertheless, the complaint in the instant case which states that the defendant brokers-underwriters "*knew* or should have known" of the misstatements in Count I even though phrased in the disjuncture, is sufficient to state a claim for 10b–5 relief. In Heit v. Weitzen, *supra,* the plaintiffs made the same allegation, and the court stated: "[i]f some form of scienter test is to be applied . . . we think that the alternative allegation of actual knowledge of falsity is amply sufficient as a matter of pleading." 402 F.2d at 914. Because we cannot say that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.

18. This reversal does not affect the dismissal of Defendants Brown, the Estate of Britton, Clayton Burton, William Burton, Horsch, Martin and Curran. The only connection of these defendants with Leeds occurred subsequent to the event alleged in Count I. The district court's dismissal on this basis as to these defendants was correct.

19. See generally, Note, Scienter in Rule 10b–5, 67 Northwestern University Law Review 562 (1972).

Ed.2d 80 (1957); we reject this argument.

## COUNT II

Assertedly constituting the second tier in a layered scheme of frauds, Count II is principally based upon events occurring subsequent to those complained of in Count I. Plaintiffs allege that the 1968 refinancing plan was agreed upon by its participants for the purpose of using corporate assets to compromise their individual Securities Act liabilities resulting from their involvement with the false and misleading statements in the debenture offering. This allegedly was a wrongful attempt to conceal and avoid liability for the fraudulent conduct complained of in Count I. The "refinancing plan and the acts of the defendants in carrying it out" are asserted to violate rule 10b–5 because adequate disclosure of the purposes and nature of the plan was not made to the common shareholders either in the September 18, 1968 letter or otherwise. Although plaintiffs allegedly "held" their Leeds' stock in reliance upon the "misstatements and omissions" connected with the plan, no plaintiff is alleged to have sold stock contemporaneously with it or as a part of it. Furthermore, the refinancing plan resulted in such a dilution of the plaintiffs' equity interest that their shares are now so deflated in value as to be almost worthless. The 10b–5 attack on the refinancing plan is also pleaded as a derivative claim, and Leeds is alleged to be a seller in carrying out the plan, but no corporate injury is pleaded.

Additionally, Count II avers that the September 18, 1968 letter was a solicitation of a "proxy or consent or authorization" within the meaning of section 14(a) of the Exchange Act, and that this letter violated the disclosure requirements of that section. The plaintiffs "relied on the false or misleading statements in the Leeds' solicitation (letter) and gave their consent and authorization to the refinancing plan by failing to object, dissent or to otherwise interpose any shareholder right."

Finally, Count II states that the September 18, 1968 letter amounted to a solicitation of security holders "in favor of a tender offer" under section 14(e) of the Exchange Act. It is asserted that the letter did not fully disclose the purpose and terms of the refinancing plan and thus violated 14(e)'s tender offer disclosure requirements.

The district court dismissed Count II's 10(b) claim on the basis that the plaintiffs lacked standing to sue under section 10(b) and rule 10b–5 since they were not "purchasers or sellers" in connection with the events alleged as violations of 10b–5 in Count II. The derivative claim was dismissed on the basis that the relief sought by the plaintiffs was direct and not derivative in nature, and no injury to the corporation was alleged. Finally, the 14(a) and 14(e) claims were dismissed because the September 18 letter neither required nor called upon the common shareholders to do anything and thus the solicitation proscribed by the terms of 14(a) and 14(e) was lacking.

## 10b–5 DIRECT CLAIM

The plaintiffs argue that they have standing to sue for damages under rule 10b–5 even though none of the individual plaintiffs is alleged to have been involved in an actual purchase or sale of stock in connection with the conduct which Count II alleges violated rule 10b–5. They proceed upon two theories. First, Superintendent of Insurance v. Bankers Life and Casualty Company, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) and Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) have in effect eliminated the requirement originally announced in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.) cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) that only purchasers or sellers can bring a private action for damages under rule 10b–5, and have accorded standing to plaintiffs who hold stock in reliance on conduct proscribed by the statute and rule. Second, even if

*Birnbaum's* purchaser-seller requirement withstands these cases, the issuance of new common shares in the 1968 refinancing plan diluted plaintiffs' existing equity interest in Leeds, thereby constituting plaintiffs as "forced sellers" of a part of their equity interest entitled to 10b–5 standing, *see* Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.) cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L. Ed.2d 460 (1967).

 We reject the first argument. The terms "purchaser" and "seller" have been broadly construed, see, *e. g.*, Herpich v. Wallace, *supra*, and Hooper v. Mountain State Securities Corp., *supra*, but before *Bankers Life* and *Affiliated Ute* this circuit's rule had always been that only a purchaser or seller of securities "in connection with" the alleged fraud had standing to sue directly for damages under section 10(b) and rule 10b–5;[20] *see, e. g.*, Herpich v. Wallace, *supra*; Rekant v. Desser, 425 F.2d 872 (5th Cir. 1970); and Cooper v. Garza, 431 F.2d 578 (5th Cir. 1970). Moreover, such standing has been required by most other circuits, *see* Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972) and cases collected therein; although recently, it was rejected by the Seventh Circuit, *see* Eason v. General Motors Acceptance Corporation, 490 F.2d 654 (7th Cir. 1973).

*Bankers Life* and *Affiliated Ute* both involved plaintiffs who were sellers of securities. In *Bankers Life*, Manhattan, the corporation represented by the plaintiff,[21] actually sold its treasury bonds, and the use of the sale proceeds was an integral part of the fraudulent scheme perpetrated on Manhattan by the defendants even though there was no misrepresentation or fraud involved in the bond sale itself. Immediately before stating that Manhattan was protected by section 10(b) and rule 10b–5, Mr. Jus-

tice Douglas expressly noted that Manhattan was the seller of treasury bonds. In fact, throughout its opinion the Court takes care to point out that Manhattan was a seller. Moreover, in a footnote the question of whether a 10b–5 claim would have been stated without the sale of treasury bonds was expressly left open, *see* 404 U.S. at 13, 92 S.Ct. at 169, 30 L.Ed.2d at 134.

The plaintiffs support their position with this quotation from *Bankers Life*:

> Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under 10(b), whatever might be available as a remedy under state law.

Of course, if we were to accept the broadest meaning of this language out of context, the underwriters offer to repurchase the debentures, or Leeds' issuance of shares in exchange for the debentures might be sufficient to allow standing for the plaintiffs. However, this language must be considered in its subject matter structure. *Bankers Life* focuses on the meaning of the "in connection with" clause in section 10(b) and is exclusively concerned with the relationship between Manhattan's sale and the defendant's alleged fraudulent scheme. It establishes that the defendant's fraudulent conduct need not specifically relate to the plaintiff's securities transaction as in a misrepresentation involving the value of securities purchased or sold by the plaintiff. Instead, the requisite nexus exists if such conduct merely touches upon the plaintiffs' purchase or sale. *See* Smallwood v. Pearl Brewing Co., 489 F.2d 579 (5th Cir. 1974). We are persuaded by this specific holding, by the Court's careful limitation of what it was deciding, and by its express footnote caveat that the pur-

---

20. The purchaser-seller requirement has been criticized by commentators. *See, e. g.*, Lowenfeld, Demise of Birnbaum Doctrine: A New Era for Rule 10b–5, 54 Va.L.Rev. 268 (1968), and Comment, The Purchaser-Seller Rule: An Archaic Tool for Determining Standing Under Rule 10b–5, 56 Geo.L.Jl. 1177.

21. The plaintiff was the Superintendent of Insurance for the State of New York, representing Manhattan in liquidation proceedings.

chaser-seller requirement of *Birnbaum* remains intact. *See* Mount Clemens Industries, Inc. v. Bell, *supra*; Landy v. Federal Deposit Insurance Corp., 486 F. 2d 139 (3d Cir. 1973); James v. Gerber Products Co., 483 F.2d 944 (6th Cir. 1973); Haberman v. Murchison, 468 F. 2d 1305 (2d Cir. 1972); *but see*, Eason v. General Motors Acceptance Corp., *supra*.

 We now move to the other authority relied upon. In *Affiliated Ute* the Court was not directly concerned with the purchaser-seller requirement, since there the plaintiffs were sellers of stock. Nevertheless, the plaintiffs rely heavily upon the Court's citation to a page of SEC v. Texas Gulf Sulphur Co., *supra*, upon which the following quotation is found:

> Thus, material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or *hold* the company's securities. (Emphasis added).

401 F.2d at 849. The basic holding of *Affiliated Ute* was that in a case involving nondisclosure, the plaintiffs had only to plead and prove that the facts withheld by the defendant were material and did not have to prove specific reliance on the part of each individual plaintiff. The citation to *Texas Gulf Sulphur* was not only supportive of the policy behind this principle but illustrative of the meaning of materiality. It is inapposite to single it out and suggest that it implies that a mere *holder* of securities could, from that time on, sue for damages under section 10(b) and rule 10b–5. Surely, a principle so widely accepted as the purchaser-seller requirement was not to be dispatched to an unmarked grave. We refuse to take this citation as implicitly rejecting the *Birnbaum* doctrine, especially since subsequent decisions of the Second Circuit have held that *Texas Gulf Sulphur* left *Birnbaum* intact. *See, e. g.*, Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 968 (2d Cir. 1969) cert.

denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). To eliminate any doubt, we expressly reaffirm the vitality of the purchaser-seller requirement in this circuit, *cf.* Smallwood v. Pearl Brewing Co., *supra*.

 We also reject plaintiffs' second argument—that the refinancing plan's issuance of new shares so diluted their position as to give them 10b–5 standing as "forced sellers." The forced seller doctrine originated in Vine v. Beneficial Finance Corp., *supra*. In *Vine* the second circuit held that a minority shareholder who, following a short form merger was faced with the choice of either holding stock in a nonexistent corporation or exchanging his shares for value, under the terms of the merger agreement or pursuant to state law appraisal rights, was a seller for purposes of 10b–5 standing. *See also*, Crane v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U. S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). That a forced seller has 10(b) standing has been recognized in this circuit. Smallwood v. Pearl Brewing Co., *supra*; Coffee v. Permian Corp., 434 F.2d 383 (5th Cir. 1970); and Dudley v. Southeastern Factor and Finance Corp., 446 F.2d 303 (5th Cir.) cert. denied, 404 U.S. 858, 92 S.Ct. 109, 30 L. Ed.2d 101 (1971). In both *Coffee* and *Dudley* the plaintiff was a shareholder in a corporation about to be liquidated. Since the plaintiff in each of these cases had no choice but "to surrender his interest in the corporation and to exchange his shares for cash," *Coffee, supra*, 434 F.2d at 386, each was held to have 10b–5 standing as a forced seller. The dicta in *Coffee* that plaintiff, as holder of common shares when the Knight family's stock was repurchased by the company, was "perhaps a purchaser", would lend support to the claim in the instant case that the consequent dilution of plaintiff's equity caused by Leeds' issuance of new shares under the refinancing plan made them forced sellers. However, any such argument is now foreclosed by Wolf v. Frank, 477 F.2d 467 (5th Cir. 1973). In *Wolf* the

court noted that the "plaintiffs do not have standing to seek individual damages for the dilution of equity interests caused by the NIB–IGB stock exchange because plaintiffs were neither purchasers nor sellers in connection with that transaction." Thus, although dilution of equity may be an appropriate measure of damages, such dilution does not confer standing. Even though *Wolf* does not expressly discuss the issue in terms of the forced seller doctrine, it puts an end to the plaintiffs' argument. Moreover, this forced seller argument must be dismissed upon another basis. In Smallwood v. Pearl Brewing Company, *supra*, this court denied direct standing to a shareholder of a merged company who had the right to exchange his shares for shares of the surviving company. *Pearl Brewing* quotes the following from Dudley v. Southeastern Factor and Finance Co., *supra*: " '*Vine's* informing principle carried forward in *Crane*, is that a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise to a right solely for payment of money for his shares.' " 446 F.2d at 307. Since Smallwood was still entitled to an interest in a "going concern" and was not forced to liquidate his interest for value, he was held not to be a forced seller for purposes of 10b–5 standing. Similarly, in the instant case the plaintiffs still hold shares in a continuing business operation. In these circumstances it would be sophistic to stretch the forced seller doctrine to allow plaintiffs 10b–5 standing. Such an expansion would carry with it the seeds for sacrificing whatever integrity the forced seller doctrine might have. Thus, we affirm the district court's dismissal of the 10b–5 direct claim.

## 10b–5 DERIVATIVE CLAIM

It is generally recognized that the issuance of stock is a sale of securities for 10b–5 purposes and that an individual shareholder although not a purchaser or seller can bring a derivative claim on behalf of a corporation which has been fraudulently induced to issue its stock. *See, e. g.,* Herpich v. Wallace, *supra*; Rekant v. Desser, *supra*; and Hooper v. Mountain States Securities Corp., *supra*. However, assuming Leeds' exchange of stock for debentures, pursuant to the refinancing plan, makes it a seller, the complaint still fails to state a claim for derivative relief, since no injury or damage to Leeds is alleged.

The district court dismissed the derivative claim without prejudice because of the absence of an allegation of injury to Leeds. The plaintiffs assert that injury is alleged in Count II in that the value of Leeds' common stock held by the plaintiffs is claimed to have become worthless. Of course, a low selling price for Leeds' stock might incidentally make it difficult for the company to obtain equity capital in the future, but a depressed price is, without more, a shareholder injury. Although a principal premise of plaintiffs argument is that the refinancing plan was intended to compromise the Securities Act liabilities of certain individual defendants, two things must be recalled; first, Leeds itself had a potential liability as to the entire 1,500,000 dollars outstanding in debentures, and second, a major option extended to the debenture holders by the plan—conversion into increased numbers of shares of Leeds' common stock—did not effect a release of claims.[22] Additionally, Leeds had agreed to indemnify the underwriters for any liabilities resulting from the debenture offering.[23] In the face of these

---

22. At oral argument counsel for defendants asserted that all debenture holders who accepted the plan elected this option.

23. *See* Section 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*. *See* Securities Act Release No. 4936, 33 Fed.Reg. 18617 (1968), in which the SEC notes that it feels that

indemnification for Securities Act liabilities is against public policy and the note to SEC Rule 460, 17 C.F.R. § 230.460. The underwriting agreement between Leeds and the underwriters contained the "Johnson and Johnson Clause" requiring submission of the legality of the agreement to a court.

facts, we refuse to imply an injury to Leeds as a corporation when the plaintiffs have failed to specify any such injury. Since the plaintiffs chose not to amend to make such an allegation after being given the chance, we affirm the district court's dismissal of the derivative claim.

## SECTION 14(a)

Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

The plaintiffs assert that the September 18, 1968 letter was covered by 14(a) because it was a solicitation to the common shareholders "to obtain their consent and authorization to the refinancing plan." It is alleged that because of the personal interests of Leeds' management in the plan as a vehicle to eliminate their individual liabilities and the failure to hold the 1968 annual meeting, shareholder approval of the plan was required. This being so, they say that the letter's purpose was to "lull" these holders into inaction so they would not unhorse the refinancing plan by forcing the overdue annual meeting and electing new directors, or otherwise attacking it through corporate or judicial channels. The plaintiffs then go on to argue that treating the letter as a proxy solicitation, it failed to meet the disclosure requirements of rule 14a–9, 17 C.F.R. § 240.14a–9. The defendants' main reply, which was accepted by the district court, is that the September 18 letter on its face did not solicit the common share-

holders to do anything, since the letter was purely informational and called for no action on their part.

It is undisputed that Leeds' common shares are registered under section 12 of the Exchange Act, that the authors of the letter were "persons" within the meaning of that term in 14(a), and that the letter was actually mailed to the common shareholders. Thus, we must resolve two threshold issues: (1) was the September 18, 1968 letter a solicitation; and, if so, (2) was it a solicitation of a "proxy or consent or authorization?" If we cannot answer one of these two questions negatively as a matter of law, we must vacate the district court's decision and remand this case for proof on these issues and for a determination of whether plaintiffs can meet the other requirements of a private action for damages under section 14(a), including proof of a substantive violation, *see* rule 14a–9; causation, *see* J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); and Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); the requisite standard of culpability for each defendant; and damages.

SEC rule 14a–1, 17 C.F.R. § 240.14a–1, defines a solicitation under 14(a) to encompass:

. . . the furnishing of a form of proxy or *other communication* to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy.

Rule 14a–1 contains the following definition of proxy:

The term "proxy" includes any proxy, consent, or authorization within the meaning of Section 14(a) of the Act. The consent or authorization may take the form of a failure to object or to dissent.

As used in the SEC's rules, proxy is a generic term which includes the broader statutory terms "consent" and "authorization". *See* L. Loss, Securities Regulation at page 871 (2d ed. 1961). To fit

within the language of 14(a) and the SEC rules, plaintiffs argue that the September 18 letter was a "communication" to Leeds' security holders "under circumstances reasonably calculated to result in the procurement" of a "failure to object or to dissent" to the refinancing plan from the plaintiff common shareholders.

 It is readily apparent from the complaint that this case is different from the usual proxy solicitation case, because no shareholder vote on the plan was ever sought, and there was no attempt to obtain any proxy in the narrow or common usage sense of that term. Indeed, since debenture conversion under the plan was to be into previously authorized but unissued stock, we can find no Florida statute which under normal circumstances would require shareholder approval or which would accord appraisal rights to the common shareholders. Likewise, since no stock was issued for cash, the common shareholders had no preemptive rights.[24] From this premise defendants argue that "in the absence of some allegation of infringement upon corporate suffrage rights or some corporate action taken as a result of such infringement, no cause of action under section 14(a) has been made out." Hoover v. Allen, 241 F.Supp. 213, 230 (S.D. N.Y.1965); see also Entel v. Allen, 270 F.Supp. 60 (S.D.N.Y.1967). This is too narrow a reading of the statute and the rules. Under Conley v. Gibson, supra, standards, we cannot say as a matter of law that the allegations of plaintiffs' complaint taken as true fail to state a claim for relief.

 Whether or not a particular communication is a solicitation within the meaning of 14(a) is a question of fact dependent upon the nature of the communication and the circumstances under which it is transmitted. Securities Exchange Act, Release No. 7208, 29

Fed.Reg. 341 (1964). Although the September 18 letter by its terms did not specifically ask for any action or inaction on the part of its recipients, the plaintiffs have alleged that its purpose was to forestall the common shareholders from interposing obstacles in the path of the refinancing plan through the exercise of their rights as shareholders. The defendants, of course, dispute that this was the purpose of the letter. However, the letter was sent at a time coinciding with the usual proxy solicitation period when certain members of Leeds' management were allegedly not only engaged in self-dealing but also were acting in a manner that conflicted with Leeds' common shareholders' best interest. At the time of its mailing, the September 14 annual meeting required by express provision of Leeds' bylaws had not been held and was not in fact held until sometime in 1969, after the plan had gone into effect. To rely exclusively upon the informational tone of the letter itself, ignoring the circumstances surrounding its transmittal, and hold as a matter of law at the pleading stage that the September 18 letter was not a solicitation, would be to ignore our duty to interpret the securities laws according to their remedial purposes, see Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and to allow defendants to do indirectly (by refusing to hold a required meeting and mollifying shareholders' reaction with a letter) what they allegedly would not do directly (hold the meeting required by Leeds' bylaws and vote on new officers, thereby subjecting the proposed plan to their scrutiny).[25] Certainly, not every communication from management is a solicitation, see Brown v. Chicago Rock Island and Pacific Railroad Co., 328 F. 2d 122 (7th Cir. 1964), and the development of proof may demonstrate that this letter was, as defendants contend, purely informational. Our holding here is no

24. See Fla.Stat.Ann. § 608.42.

25. The totally different circumstances surrounding the mailing of the letter in the instant case and the fact that this case has

progressed no farther than the pleadings distinguishes it from the letter involved in Smallwood v. Pearl Brewing Co., supra, which was held not to be a solicitation of a proxy, authorization or consent.

more than that Conley v. Gibson, section 14(a) and rule 14a–1 preclude an adjudication at this stage that this letter could not be a solicitation.

■ Similarly, we cannot hold that the inaction which the letter allegedly "solicits" is not as a matter of law at least a "consent". The word "consent" in section 14(a) is not limited by the preceding word "proxy". Dunning v. Rafton, CCH Fed.Sec.L.Rep. ¶ 91660 at 95437 (N.D.Cal.1965) and Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967). "The solicitation of consent would, according to common usage, include any circularizations requesting or urging a security holder to concur in or go along with the solicitors' proposals," Dunning, supra at 95437. Because of the inclusion of "a failure to object or dissent" as a form of authorization or consent in rule 14a–1, promulgated pursuant to the express statutory authorization in section 14(a), we hold that the plaintiffs' allegation that defendants solicited nonassertion of plaintiffs' rights to block the refinancing plan through corporate or judicial action, is sufficient under Conley v. Gibson standards to plead a solicitation of an authorization or consent. Thus, we vacate the district court's dismissal of this issue and remand for further proceedings not inconsistent with the opinion. Of course, in so doing we intimate no view on the ultimate merits of this issue.

## SECTION 14(e) CLAIM

Section 14(e) of the Securities Exchange Act provides:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

Plaintiffs argue that the September 18, 1968 letter was a "solicitation of security holders . . . in favor of" a tender offer and that as such it violated 14(e) in failing to disclose to the shareholders inter alia the conflicting interests of the participants in the refinancing plan.

In reasoning our refusal to agree, we initially note that the letter stands on a different footing from the actual debenture offer, since the plaintiffs do not complain of misrepresentations or omissions in the actual offer to the debenture holders. Indeed, that offer discloses directly that certain of its participants may be liable under the Securities Act to the debenture holders because of misstatements in the August 1967 debenture prospectus, rather than containing, as the letter does, a reference to other documents where liabilities are discussed.

The process of analysis we follow makes it unnecessary to reach two important but unsettled issues in this field. Neither the Exchange Act nor the rules promulgated under it define the term "tender offer" as used in section 14(e). The underwriters' offer to repurchase debentures as part of the refinancing plan was registered as a tender offer under section 14(d)(1), 15 U.S.C. § 78n, rule 14d–1, 17 C.F.R. § 240.14d–1, and schedule 13D, 17 C.F.R. § 240.13d–101. Moreover, the offer's limited duration [26] and the requirement of acceptance by 80% of the debenture holders before its covenants became effective liken it to a conventional tender offer. See Note, The Developing Meaning of "Tender Offer" under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250 (1972); and Smallwood v. Pearl Brewing Co., supra. However, we intimate no ruling on this proposition since our ultimate disposition of this issue allows us to assume without actually deciding that the

---

**26.** The offer expired November 15, 1968.

"refinancing plan" involved a tender offer within section 14(e). Similarly, neither section 14(e) nor the SEC rules contain a definition of the term "solicitation" in 14(e). Whether the meaning of "solicitation" in 14(e) is as broad as the meaning of "solicit" in 14(a) is an open question. The district court seemed to equate the two when it held in the same paragraph that the September 18 letter was not a solicitation under either 14(a) or 14(e). Again, for purposes of this decision, we will assume, without deciding, that the letter was a 14(e) solicitation.

■ Section 14(e) was enacted as part of the Williams Act of 1968. It was prompted by the increased use of cash tender offers as a means of obtaining corporate control and was designed to fill a gap in the securities laws which left "the cash tender offer exempt from disclosure provisions." See H.Rep.No. 1711, 90th Cong., 2d Sess. U.S.Code Cong. and Adm.News, p. 2811 at p. 2813. Such a gap existed because pre-Williams Act coverage of the securities laws depended upon the method used to obtain control.[27] The Act's remedy is to add to former regulatory methods as additional approach which requires "full and fair disclosure for the benefit of *investors* while at the same time providing the offeror and management equal opportunity to fairly present their case." H.Rep. No.1711, *supra* at p. 2813. The focus of the legislative history of section 14(e) is on adequate disclosure to those investors whose tenders are being solicited so that an informed meaningful consideration of the alternatives can be made.

Although section 14(e) does not expressly provide for a private right of action, courts have uniformly implied one. *See* Smallwood v. Pearl Brewing Co., *supra*, 489 F.2d at 596, n. 20. In determining who has standing to sue under 14(e), the quest has been for what will best further the objective of the statute. Consequently, the right to bring suit has not been limited to tendering offerees only but has been extended to numerous other parties who claimed to be victims of 14(e) violations. *See* Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2d Cir. 1973) (tender offeror had standing to sue target company's management and competing offeror); Electronic Specialty Company v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969), (target company and target company's nontendering shareholders had standing to sue for injunctive relief); H. K. Porter, Inc. v. Nicholson File Co., 482 F.2d 421 (1st Cir. 1971) (tender offeror had standing to sue target company's management); *see also* Gulf and Western Industries, Inc. v. Great Atlantic and Pacific Tea Company, 476 F.2d 687 (2d Cir. 1973); *but see* Washburn v. Madison Square Garden Corp., 340 F.Supp. 504 (S.D.N.Y.1972).

■ Assuming the September 18 letter was a solicitation, the abstract language of section 14(e) might be broad enough to encompass the plaintiffs' claim. Nevertheless, the policy behind the statute, as revealed by the legislative history, compels us to read the term "security holders" in 14(e) as those security holders to whom the offer is addressed. The evil to be remedied was inadequate disclosure to tendering security holders. Congress made it clear that the investor protection sought by 14(e) was disclosure to those who had to make the hold or sell decision. See U.S. Code Cong. and Admin.News, *supra*, at p. 2811 et seq.

■ No violation of 14(e) could be shown where the class sought to be protected has not been harmed. In the instant case the plaintiffs have not alleged any inadequacy of disclosure in the offer to the debenture holders. Plaintiffs stand in no better position than would the shareholders of a tender offeror complaining of misleading statements in a proxy solicitation involving a completely valid tender offer that required shareholder approval. Such a shareholder should not be allowed to sue under 14(e) (in addition to 14(a)) because he argues that the proxy solicitation was a

---

27. If the method was a proxy contest, section 14(a) would apply. If the method was a B reorganization (stock for stock exchange), *see* Int.Rev.Code of 1954, § 368(a)(1)(B), registration under the Securities Act would be required. However, there were no such disclosure requirements if a cash tender offer was used.

solicitation of security holders in favor of a tender offer.[28] We affirm the district court's dismissal of this claim albeit on a different basis.

## COUNT III

## INJUNCTIVE RELIEF

The complaint alleges various continuing violations of the securities laws by Leeds' management and mandatory and prohibitive injunctive relief was sought. After taking proof the district court found that plaintiffs had failed to show that the present Leeds' management had committed or threatened to commit any of the securities law violations alleged in Count III, or to demonstrate that any harm, let alone irreparable harm, would accrue to them, and no preliminary injunctive relief was granted. Additionally, in line with its rulings on Counts I and II and its dismissal of Count IV, the district court concluded that Count III standing alone contained insufficient allegations to support permanent injunctive relief. It, accordingly, dismissed that count also.

 Our review of the exercise of discretion by the trial court in refusing preliminary injunctive relief must be closely circumscribed. It comes to us on an abbreviated development of facts. It requires a balancing of the probabilities of ultimate success on the merits with the consequences of court intervention at a preliminary stage. The prerogative to weigh the nice distinctions involved belongs to the district court, not this court. Bayless v. Martine, 430 F.2d 873 (5th Cir. 1970); Exhibitors Poster Exchange v. National Screen Service Corp., 441 F.2d 560 (5th Cir. 1971); Eli Lilly and Co. v. Generix Drug Sales, Inc., 460 F.2d 1096 (5th Cir. 1972). *See also* C. Wright and A. Miller, Federal Practice and Procedure § 2962, p. 633–36. Nothing in the record

before us demonstrates that the district court abused its discretion here. That court's determination that plaintiffs had not demonstrated the requisite probability of success appears to relate to the merits. Thus, our partial reversal of the district court's disposition of defendants' motions to dismiss would not taint its denial of preliminary injunctive relief. However, caution indicates that upon remand the district court should reconsider its denial of preliminary relief in light of the outcome of this appeal.

Since the district court's refusal of permanent injunctive relief is predicated in part upon dismissal of Counts I and II, which we have in part reversed, we vacate the dismissal of Count III and remand the issue of plaintiffs' entitlement to permanent injunctive relief for further consideration not inconsistent with this opinion. Finally, we also remit to the district court's discretion the question of whether interim attorneys' fees at this stage of the proceedings are proper. For emphasis, we again expressly disclaim all intent to indicate or intimate what the result of the exercise of that court's discretion should be.

Affirmed in part, reversed in part, and remanded.

## ON PETITION FOR REHEARING

### PER CURIAM:

It is ordered that the petition for rehearing filed on behalf of appellee, Clayton Burton, in the above entitled and numbered cause be and the same is hereby denied, provided however that this denial is without prejudice to the rights of Clayton B. and William M. Burton, Richard E. Hortch, and William B. Curran to present to the District Court the issue of their nonliability under Count II of the Amended Complaint.

---

28. We caution that we do not hold that the plaintiffs in the instant case would have no standing to sue under 14(e) if there had been misleading statements in the offer to the debenture holders. *See* Dyer v. Eastern Trust and Banking Co., 336 F.Supp. 890 (D.Me.

1971) where the court accorded standing to shareholders of the tender offeror. The question would then be whether these plaintiffs were appropriate plaintiffs to enforce the duties created by 14(e). Here these duties have not been violated.