Frank BROWN, Plaintiff-Appellant,

v.

CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY, a Corporation, and Union Pacific Railroad Company, a Corporation, Defendants-Appellees.

No. 14347.

United States Court of Appeals Seventh Circuit.

Feb. 10, 1964.

Rehearing Denied March 17, 1964.

Samuel H. Young, Theodore W. Grippo, of Hough, Young & Coale, Chicago, Ill., for plaintiff-appellant.

David Ferber, Associate Gen. Counsel, S. E. C., Washington, D. C., for Securities and Exchange Commission.

Stuart S. Ball, Walter J. Cummings, Jr., Henry A. Preston, Chicago, Ill., for defendant-appellee, Union Pac. R. Co. Sidley, Austin, Burgess & Smith, Chicago, Ill., Carr, Clark & Ellis, New York City, of counsel.

Don H. Reuben, A. L. Hodson, Chicago, Ill., for defendant-appellee Chicago, R. I. & P. R. Co., Lawrence Gunnels, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, and KILEY and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

This action was brought in the district court by Frank Brown, a stockholder in Chicago, Rock Island & Pacific Railroad Company, against defendants, Union Pacific Railroad Company and Rock Island. Plaintiff proceeded individually and did

not seek relief on behalf of others. Plaintiff sought to enjoin defendants from alleged unlawful proxy solicitation [1] and an order requiring defendants to retract or correct statements made in the alleged proxy solicitation.

The Securities and Exchange Commission was granted leave to participate in the district court proceedings as *amicus curiae* and to file a legal memorandum supporting plaintiff's position. The Commission also argued orally before this court.

In the district court, Rock Island filed a motion to dismiss the action under Rule 12(b) (6), Federal Rules of Civil Procedure, 28 U.S.C.A., and for summary judgment under Rule 56(b). Union Pacific filed a motion to dismiss under Rule 12(b) (6). The district court granted each of the several motions and rendered judgment accordingly. Plaintiff appealed.

Each of the motions filed below was supported by evidence and affidavits and plaintiff testified in the hearing thereon. We shall treat the motions to dismiss as motions for summary judgment, as did the district court.

The following events preceded the alleged unlawful proxy solicitation.

On May 13, 1963, management representatives of Rock Island and Union Pacific, after several months of negotiation, publicly announced their agreement to recommend to their respective boards of directors a plan for merger of the two railroads.

On or about June 24, 1963, Chicago & North Western Railway Company publicly announced, by a press release and distribution of a brochure to a group of security analysts in New York City, and transmitted by letter to Rock Island, its offer to purchase control of Rock Island. This offer, in essence, was that North Western would exchange $5.00 in cash, one North Western 6% collateral trust income bond due in fifty years with a face value of $30.00 and .2778 of a share of North Western common stock for one share of Rock Island common stock.

On June 27, 1963, the Rock Island and Union Pacific boards of directors formally adopted and executed the plan for merger which had been recommended to them on May 13, 1963.

On or about July 3, 1963, North Western filed two applications with the Interstate Commerce Commission. One application sought Commission approval, under § 5(2) of the Interstate Commerce Act, 49 U.S.C.A. § 5(2), of North Western's proposal to acquire Rock Island stock. The other application sought Commission approval, under § 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a, of North Western's proposal to issue common stock and a new security as part of its exchange offer to Rock Island stockholders.

On July 25, 1963, Union Pacific filed a petition with the Commission opposing North Western's applications. This petition was entitled:

"Petition of Union Pacific Railroad Company for Leave to Intervene, and Motion to Dismiss the Applications on the Ground that the Authorities Sought are Contrary to the Public Interest and the Applications on Their Face are Otherwise Defective."

Union Pacific published the advertisement, which is in issue in this case, in

---

1. Section 14 of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78n provides:

   "(a) It shall be unlawful for any person, * * * to solicit * * * any proxy or consent or authorization in respect of any security * * * registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

   SEC Reg., 17 C.F.R. § 240.14a–3, states:

   "(a) No solicitation subject to * * * [this regulation] shall be made unless each person solicited is concurrently funished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A."

about forty-five newspapers in the United States on July 26, 1963.[2] There was no subsequent publication or other distribution of the advertisement. Each city in which the advertisement was published was served by either Union Pacific or Rock Island, except New York City and Washington, D. C.

The advertisement was prepared and published by Union Pacific. The only evidence connecting Rock Island with the advertisement was a telephone conversation, in which the proposed advertisement was discussed, between an attorney in Chicago representing Union Pacific in the proposed merger and an officer of Union Pacific in New York. An officer of Rock Island heard this conversation by means of a "loudspeaker" conference telephone in Chicago. He was present in the attorney's office in connection with other business and did not participate in such telephone conversation.

In the district court, plaintiff contended that the advertisement was an unlawful proxy solicitation in violation of Section 14 of the Securities and Exchange Act of 1934 and Regulations promulgated thereunder, supra, because no proxy statement accompanied the advertisement.

On appeal, plaintiff contends that the advertisement was an illegal solicitation, as a matter of law. In the alternative, plaintiff contends that a question of fact exists on the issue of whether the advertisement was an illegal proxy solicitation, and that the district court erred in granting the motions for summary judgment.

SEC Reg., 17 C.F.R. § 240.14a–1 defines "solicitation" as follows:

"(f) *Solicitation.* (1) The terms 'solicit' and 'solicitation' include:

"(i) Any request for a proxy whether or not accompanied by or included in a form of proxy;

"(ii) Any request to execute or not to execute, or to revoke, a proxy; or

"(iii) The furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."

Plaintiff contends that the advertisement was a "communication to security holders under circumstances reasonably calculated to result in the procurement * * * of a proxy." Defendants assert that the circumstances surrounding the publication of the advertisement and the advertisement itself demonstrate otherwise.

Twenty-three days before the advertisement was published, North Western filed the above-mentioned applications with the Interstate Commerce Commission seeking approval of North Western's proposal to acquire Rock Island stock. In considering North Western's applications, the Commission is required to give weight to, "(1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." Interstate Commerce Act § 5, 49 U.S.C.A. § 5(2)(c). Approval is to be granted only if "compatible with the public interest." Interstate Commerce Act § 20a, 49 U.S.C.A. § 20a(2). The Commission is authorized to hold public hearings and allow interested persons to be heard. Interstate Commerce Act § 5, 49 U.S.C.A. § 5(2)(b).

The advertisement was published concurrently with Union Pacific's petition to intervene and its motion to dismiss in the proceeding before the Commission.

Testimony in the district court concerning the aforementioned telephone conversation was to the effect that Union Pacific considered the advertisement to be

2. The advertisement in issue is set out in full in the Appendix to this opinion.

a summary of its petition and motion before the Commission.

At the time of the advertisement, Rock Island had not called a stockholders' meeting and no proxies had been solicited. In fact, the meeting was not called until October 1, 1963 and was set for November 15, 1963.

From a consideration of these circumstances, it appears that Union Pacific's purpose in publishing the advertisement was to inform the public and motivate it to oppose North Western's applications before the Commission. This is a valid purpose inasmuch as the Commission is required to consider the public interest and interested members of the public may be given an opportunity to be heard at a Commission hearing.

Consideration of the advertisement corroborates the view that its purpose was to inform and motivate the public rather than to solicit proxies.

The advertisement was not directed solely to Rock Island stockholders. It was entitled "Rock Island Stockholders, Employees, Shippers, [and] Midwest Communities will all benefit more if the Rock Island merges with the Union Pacific." The text of the advertisement stated that a Union Pacific-Rock Island merger would result in lower costs to shippers, better service to communities and substantial benefits to Rock Island stockholders. It also said that the North Western offer, if accepted, would result in decreased employment and payroll cuts. It was, in effect, a counter-argument to North Western's applications pending before the Commission.

Frank E. Barnett, vice president and general counsel of Union Pacific testified as to the selection of cities in which the advertisement was published. He stated that:

"* * * [T]he cities were selected by me because the ad bore on a matter which had many factors of public interest in it and which will be necessary to be determined by the Interstate Commerce Commission with a primary view to the further-

ance of the public interest. Accordingly, the cities selected were those cities where the public interest might be manifested in the form of organizations, various individuals who might subsequently appear in the Interstate Commerce Commission pleadings where the matter of the public interest will be determined."

Nowhere in the advertisement were proxies solicited, nor was it stated that proxies would be solicited in the future. We find nothing in the record to substantiate the conclusion that it was a "communication to security holders under circumstances reasonably calculated to result in the procurement" of proxies.

It is quite clear and undisputed from plaintiff's testimony surrounding his verification of his complaint, that his knowledge concerning false or misleading statements in the advertisement was limited to what his counsel had told him. He was not permitted to amplify his testimony and obviously knew only that the complaint made the allegations set out therein. We find that the facts established by defendants' affidavits and other evidence were uncontradicted. There was no genuine dispute as to a material issue of fact concerning the purpose and intent surrounding the publication of the advertisement in question.

■■ We hold, after consideration of the advertisement and the undisputed circumstances surrounding its publication, that the purpose of the advertisement was to inform and motivate the public and it was not "reasonably calculated to result in the procurement" of proxies within Section 14 of the Act, supra. The district court did not err, as a matter of law, in granting defendants' motions to dismiss and for summary judgment.

Rock Island, in addition to defending on the ground that the solicitation was lawful, asserts that it did not participate in the composition or publication of the advertisement and therefore plaintiff is not entitled to relief against it. Since the only evidence connecting Rock Island

with the advertisement was the above-mentioned telephone conversation, we agree with Rock Island. There was a complete absence of any material evidence showing that Rock Island participated in the preparation and publication of the Union Pacific advertisement.

We have carefully considered the arguments advanced orally by the Commission on this appeal. We have no quarrel with the general propositions and rules applicable to proxy solicitations it urges. However, under the facts of this case, we do not find them controlling here.

For the foregoing reasons, the judgment of the district court is affirmed.

Affirmed.

# APPENDIX

## A Statement from Union Pacific Railroad

### Rock Island Stockholders, Employees, Shippers, Midwest Communities will all benefit more if the Rock Island merges with the Union Pacific

### The UP Merger Is Better for Growth, Service and the National Economy

A Union Pacific-Rock Island merger would bring growth—not shrinkage and retreat.

Rock Island stockholders would get an ownership interest in these important benefits:

a) A long and successful earnings and dividend record.

—The Union Pacific has paid dividends for 63 consecutive years.

b) Extensive mineral resources and the cash to develop them.

—The UP earned $24 million last year from oil and gas and mineral operations and, in addition, has coal, iron ore, potash, titanium, beryllium, and vanadium properties.

c) A highly efficient transportation plant.

—Last year the UP made over $46 million on its railway operations.

Under the Union Pacific merger proposal, major savings would come from building a more efficient overall operation, and from the low cost simplicity of single line service between Chicago, Peoria and St. Louis and Pacific Coast points. Only a limited amount of overlapping or duplicate facilities would be involved.

By contrast, the Chicago and North Western Railway, in its June 24 offer to control the Rock Island, estimates that at least 990 positions would be eliminated from the overhead departments alone, resulting in annual payroll cuts, including fringe benefits, of nearly $8 million.

The North Western also proposes to consolidate lines, tracks, freight train services and equipment and repair facilities in five states. The North Western did not say how many jobs would be eliminated in these consolidations, but it did estimate that annual savings, including fringe benefits, would exceed $6 million.

The UP would bring urgently needed capital to invest in improving the Rock Island's facilities. Since World War II Union Pacific has spent $1 billion on capital improvements to modernize its facilities and provide superior service. The UP pledges that when its merger with Rock Island occurs, it will extend this capital expenditure program to Rock Island properties, upgrading rolling stock equipment, tracks and bridges. It will modernize the Rock Island's operations through centralized traffic control, microwave and other communications projects.

Competition with trucks and airlines will be strengthened. Shippers and communities served by the Rock Island and Union Pacific will benefit from better, more efficient service.

### Let's Analyze the North Western Offer

On July 25, the Union Pacific filed a petition with the Interstate Commerce Commission asking that the North Western application to control the Rock Island be dismissed as against the public interest. The petition contains the following analysis of the North Western proposal.

The North Western announced the following offer to Rock Island stockholders for each share of their stock:

1. $5 in cash.

2. $30 face value of North Western 6% collateral trust income bond—due in 50 years.

3. 27.78% of a share of North Western common stock.

It is of utmost importance that Rock Island stockholders examine this offer carefully.

### Where Will the North Western Get the $5 in Cash?

If all Rock Island stockholders accepted the North Western offer of $5 in cash for each share of Rock Island, the cash required would be over $15 million. As the North Western's application shows, on December 31, 1962, its working capital was only $7,109,-907. This does not take into account long-term debt due within one year, which according to the year end financial statement, amounted to $14,581,101.

The $10 million windfall in the form of a federal income tax refund announced recently by the North Western will not be sufficient to meet the requirements of its bonds and preferred stock. The non-recurring nature of such income should be carefully considered in any appraisal of the longer term prospects for the Rock Island if its stockholders accept the North Western offer.

### What Would the North Western Offer Be Worth after Taxes?

Part of what most Rock Island stockholders would get from the North Western would be subject to immediate capital gains tax. This would vary according to the stockholder's circumstances. It could very easily cost the stockholder the $5 in cash offered by the North Western.

Contrast the Union Pacific proposal of .718 share of Union Pacific common stock for each share of Rock Island. As an exchange of stock, the UP merger is considered nontaxable to the Rock Island stockholder unless and until he sells his Union Pacific stock. An Internal Revenue Service ruling on this is being requested.

### What Would the $30 North Western Income Bond Really Be Worth?

To get a better idea of what the new North Western bonds would be worth, let's look at an existing North Western bond issue. The North Western has outstanding a second mortgage convertible 4½% income bond due in 1999. This mortgage bond, which would rank ahead of the new bond and mature earlier, sells currently for 30% below face value.

### How Would the North Western Get the Money to Pay the Interest?

The new bonds would pay interest only if earned. Any interest would have to come primarily from dividends on the Rock Island shares exchanged for the North Western package. In other words for interest on the new bonds, the Rock Island shareholders would be forced to depend on dividends to which they are already entitled. The quarterly dividend rate of the Rock Island was cut to 25 cents per share last year, and the Rock Island hasn't paid an annual dividend high enough to cover the interest on the proposed bonds since 1957.

If dividends on the Rock Island stock were insufficient to cover interest on the new bonds, then interest supposedly would have to come from "available net income" of the North Western. Such income is not available now. In fact, holders of the new bonds would have to wait in line behind other security holders to whom the North Western owes money already.

The North Western offer also puts a double claim on Rock Island dividends. If the North Western offer were accepted, any Rock Island dividends would supposedly go to pay interest on the new so-called $30 bonds. But any such dividends would also be income to the North Western and under the terms of North Western's mortgages would have to be made available to pay interest and sinking funds on the North Western's first mortgage bonds and second mortgage income bonds. This would necessarily create a serious conflict of interest between North Western and Rock Island.

### North Western's Dividend Record

The North Western is offering its own common stock as part of its control package. No dividends have been paid on North Western's common stock since 1950. Before any dividends can be paid on its common, the North Western must pay a preferred stock dividend of 5% per year. No dividends have been paid on North Western's preferred stock since 1954.

The Union Pacific is currently paying an annual dividend of $1.60 per common share. At this rate, Rock Island stockholders immediately upon exchange of stock under the UP merger would get an increase of 15% in dividends over the $1 per share now paid by Rock Island (based on the ratio of .718 share x $1.60 which equals $1.15).

### Union Pacific vs. North Western
### Growth vs. Retreat

The Union Pacific merger with Rock Island means growth and progress. The North Western offer implies consolidation of duplicate facilities, tearing up of tracks and facilities, and a questionable financial future.

Rock Island stockholders, employees, shippers and Midwest communities all have a major stake in supporting a merger with Union Pacific and making sure that the North Western offer is rejected.

Union Pacific Railroad
120 Broadway, New York 5, N. Y.