IT IS HEREBY ORDERED that defendants' motion to transfer venue be and the same is denied.

IT IS FURTHER ORDERED that plaintiff's motion for default be and it is denied as moot, the Court having granted defendants leave to file their answer and counterclaim.

CONAGRA, INC., and CAG Acquisition Corporation, Plaintiffs,

v.

TYSON FOODS, INC., and Holly Acquisition Corporation, Defendants.

Civ. No. 89–0–65.

United States District Court, D. Nebraska.

Feb. 23, 1989.

John E. North, McGrath, North, Mullin & Kratz, Omaha, Neb., for plaintiffs.

Kirk S. Blecha, Baird, Holm, McEachen Pedersen, Hamann & Strasheim, Omaha, Neb., and George A. Zimmerman, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

## MEMORANDUM AND ORDER

RICHARD E. ROBINSON, Senior District Judge.

Presently pending for the Court's consideration are the parties' respective motions for preliminary injunctive relief for alleged violations of federal securities laws. The previous procedural aspects of this action are as follows: On January 24, 1989, plaintiffs, ConAgra and its wholly-owned subsidiary CAG Acquisition Corporation, filed their complaint in this action. On January 25, 1989, the plaintiffs filed application for a temporary restraining order requesting that the defendants be enjoined from disseminating false, misleading, inaccurate, or incomplete information. The Court heard oral argument from both parties on the

plaintiffs' application on January 27, 1989, and issued a temporary restraining order on January 30, 1989. That Order expired by its own terms on February 9, 1989. On February 2, 1989, defendants, Tyson Foods and its wholly-owned subsidiary Holly Acquisition Corporation, filed an answer and counter-claim alleging that the plaintiffs had violated federal securities laws and filed a motion for preliminary injunctive relief. The Court consolidated the parties' motions for preliminary injunctive relief for hearing, and on February 10, 1989, received the parties' respective evidentiary documents.

On February 14, 1989, the Court heard oral argument on the plaintiffs' motion for a preliminary injunction enjoining the defendants from issuing or causing to be issued any false or misleading information or communications regarding either the proposed deal between the defendants and Holly Farms or the Merger Agreement between plaintiffs and Holly Farms. Plaintiffs' request is based on Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C.A. Section 78n(e). The Court also heard argument on defendants' cross-claim for preliminary injunctive relief requesting that the Court order the plaintiffs to fulfill disclosure requirements under federal securities laws (specifically Sections 14(a) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C.A. Sections 78n(a) and 78n(e)) by disclosing all material information necessary to make previously released information accurate. These motions are presently ripe for resolution.

As is well known the parties to this action are engaged in a spirited corporate contest over the acquisition of Holly Farms Corporation, a food production and processing concern. Although this corporate contest began in earnest in October, 1988, when it became publicly known that defendant Tyson had proposed a merger with Holly Farms, the operative facts for the purposes of this litigation occurred between the dates of January 18–24, 1989. Responding to Vice Chancellor Harnett's decision in *In Re Holly Farms Corporation Shareholders Litigation*, Del.Ch., CA–10350, slip op. (Dec. 30, 1988) [1988 WL 143010] (in which the court preliminarily enjoined termination fee and expense clauses of the ConAgra–Holly Merger Agreement and enjoined effectuation of their Asset Option Agreement), the Holly Farms Board conducted an auction for the sale of Holly Farms. Apparently Holly Farms informed both ConAgra and Tyson that a meeting of its Board would be held on January 18, 1989, in New York City and that the Board would entertain proposals for acquisition of Holly Farms at that time. Responding to this invitation, ConAgra resubmitted its previously negotiated Merger Agreement with Holly Farms, while Tyson submitted a two-tier proposal offering $61.10 or $63.00 per share for all of Holly Farms' stock depending upon whether the Holly Board adopted certain amendments to its Restricted Stock Long–Term Performance Bonus Plan. Throughout the evening of January 18th, and the early morning hours of the 19th, the Holly Board considered the submitted proposals, continued to negotiate with Tyson's representatives, and solicited and urged ConAgra to increase its proposal. It is clear from the various depositions and exhibits submitted in this action that when the Holly Board adjourned at approximately 4 a.m. on the morning of January 19th, 1989, an agreeable proposal as to economics existed between Holly Farms and Tyson. (*See* Defendant's Exhibit 5, McDonald Dep. p. 98, and Exhibit 6 thereto, p. AH–264–265). It is equally clear, however, that the agreeable proposal extended to economics only, the crown jewel of which was Tyson's proposal of $63.50 for Holly shares, and did not constitute a complete, agreed upon deal. Rather, the form and details of an agreement embodying Tyson's economic proposal were left for Holly Farms' and Tyson's respective attorneys to thrash out. (*See* Exhibit 5 McDonald Dep. p. 98; Exhibit 10, Waters Dep., p. 97). Through its representative, Stephen Waters, who was advising the Holly Board through the evening of January 18th and the morning of January 19th, Morgan Stanley, Holly Farms' financial advisor, stated that it could or would recommend the Tyson pro-

posal to the Holly Farms Board based on its economics, but did not actually, unconditionally do so either at the January 19, 4 a.m. adjournment of the Holly Board, or thereafter. (*See* Waters Dep., p. 97). Morgan Stanley's recommended approval was contingent upon actually securing and delivering Tyson's $63.50 proposal for the Holly shareholders, an event which significantly concerned both the Holly Farms Board and its financial advisor, Morgan Stanley's Stephen Waters. As of 4 a.m. on the morning of January 19th, 1989, no definitive deal had been reached between Tyson and Holly Farms. Holly's and Tyson's legal representatives met between the hours of 4 a.m. and 8 a.m. to forge a structure of the agreement which would deliver the previously negotiated and satisfactory economic terms.

Despite the potential agreement as to economics, Holly Farms' and Tyson's representatives were unable to consummate an agreement as to the structure or form that any deal should assume. Significant issues such as indemnity for Holly Farms and its Board for any resulting liability to ConAgra, and Tyson's refusal to amend its standstill agreement from its then current floor of $52.00 per share to the proposed $63.50 per share forestalled any agreement between the companies. Suffice it to say that no agreement had been reached, no actual deal struck, when the Holly Board reconvened at approximately 8:30 a.m. on January 19, 1989.

In an attempt to overcome the impasse in formulating an agreement, Tyson's representative, Michael Schell, suggested that Holly and Tyson issue a joint press release as a solution to consummating the Tyson proposal to Holly Farms. Schell apparently suggested this device as a method to overcome David McDonald's, Holly's counsel's, concerns regarding Holly's previously executed Merger Agreement with ConAgra. In acquiescing to this suggestion McDonald asked his associate, Michael Goroff, to draft a joint press release along the lines previously discussed by Schell and McDonald. (*See* Def's Exhibit 5, McDonald Dep., Exhibit 8). Goroff's draft was then edited by Mr. Schell (Id., Exhibit 9). It was

never agreed, however, between Holly Farms' and Tyson's representatives that this joint press release would be issued. (*See* Schell Dep., p. 57, 99). When the Holly Board reconvened at approximately 8:30 a.m. (eastern time) on January 19, 1989, no definitive deal had been made between Holly Farms and Tyson.

At approximately 7:15 a.m. (8:15 a.m. eastern time) on the morning of January 19, Robert Justice, a Tyson vice-president, contacted television station KHOG in Fayetteville, Arkansas, with the information that Tyson had acquired Holly Farms. This information had been relayed from Mr. Tyson in New York City to Tyson officials in Arkansas in the early morning hours of that day. Anchorwoman Susan Rodman took the call, and publicly made the announcement on the 7:25 a.m. (8:25 a.m. eastern time) and the 8:25 a.m. (9:25 a.m. eastern time) editions of KHOG's news broadcasts. At that time Justice was unable to provide details of the acquisition other than that Tyson had improved its bid to $63.00 per share (a mistaken figure, but not a subject of this action) for Holly Farms' stock. Later in the day at approximately 12:10 p.m. (1:10 p.m. eastern time) Justice informed Rodman that the purported deal had hit a snag. Later still Rodman learned from Tyson that the actual proposed stock price was $63.50 per share of Holly stock. In its 5:00 p.m. broadcast (6:00 p.m. eastern time), KHOG stated that the Tyson–Holly Farms deal had hit a legal snag, information it had previously received from Tyson's representative, Bob Justice.

The January 19 morning broadcast of KHOG was picked up and disseminated by various wire services, eventually appearing on the Dow Jones wire service at approximately 12:41 p.m. (eastern time). (*See* Rodman Dep., Exhibit 4). Later that day Holly Farms issued a press release denying that it had reached a decision on the Tyson proposal and "that there could be no assurances that the Board's deliberations would result in a recommendation of the Tyson proposal". (*See* Schell Dep., exhibit 9).

On January 19, 1989, after reconvening, the Holly Farms Board considered the Tyson proposal for the balance of the day and into the early evening before again adjourning without having acted to either accept or reject the proposal. Physically spent, the Board decided to adjourn for the evening and reconvene the next morning, January 20, to again examine the Tyson proposal.

In the late afternoon of January 19, Schell telephonically dictated a news release to Justice's secretary in Arkansas which became the basis of the news release issued by Tyson on the morning of January 20, 1989, at approximately 10:00 a.m. (11:00 a.m. eastern time) (See Schell Dep., exhibit 11). The information in this release crossed the Dow Jones wire service at approximately 11:19 a.m. (eastern time) bearing a headline appended by the Dow Jones service which stated "Tyson Foods Says Holly Farms Board to Back $63.50—Share Offer." (Schell Dep., exhibit 12). Tyson then issued another news release to state "that it had been told at approximately 4 a.m. on Thursday morning, January 19, that the Holly Farms board would approve Tyson's $63.50 proposal as previously announced." (Schell Dep., exhibit 14).

When the first January 20 Tyson new release was issued the Holly Farms Board was still deliberating on the proposal that Tyson had previously submitted. By approximately 11:50 a.m. (eastern time) January 20, 1989, the Holly Farms Board had adjourned, having decided to reject the Tyson proposal. This decision was embodied in Lee Taylor's letter to Don Tyson, and was the subject of a Holly Farms news release issued late in the day on January 20, 1989. (*See* Blecha Affidavit, exhibit 12; Exhibit 16 to McDonald Dep.).

Also on January 20, 1989, contemporaneously with the release of Tyson's news report through the office of Bob Justice, Michael Schell and his associates were preparing on Tyson's behalf a letter demanding that the Holly Board accept the agreeable economic proposals that Tyson and Holly had negotiated in the early morning hours of January 19. (*See* Exhibit 2 to Schell Dep.).

On January 19 and 20, 1989, trade in Holly Farms stock on the New York Stock Exchange attained levels well in excess of its average trading volume. Shares tendered to Tyson also increased substantially during the days following this flood of activity. It appears, however, that the volume of shares tendered to Tyson, also receded precipitously (*See* Exhibit 3 to Blecha Affidavit).

On January 24, 1989, ConAgra filed the instant action alleging that the news releases Tyson issued during the course of events transpiring between January 18 and 20th, 1989, violated federal securities laws. On that same day ConAgra issued a press release concerning the recently filed litigation. (*See* Exhibit 2 to Blecha Affidavit).

This factual recitation generally sets forth the pertinent facts to this action. Specific references shall be made to relevant facts in the discussion below. Initially, however, the Court shall set forth the standard for weighing a motion for preliminary injunction established in the Eighth Circuit.

In *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc) the Eighth Circuit stated that in determining "[w]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm, (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that movant will succeed on the merits; and (4) the public interest." In noting that the probability of success on the merits element had caused considerable difficulty in application, the court stated that "[t]he very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test." *Id.* Instead, "the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." In *Dataphase* the court eschewed a mathematical formulation of the probability test, opting

instead for an "approach flexible enough to encompass the particular circumstances of each case." When the court is called upon to balance the equities no single factor is determinative. *See also Calvin Klein Cosmetics Corp. v. Lenox Laboratories*, 815 F.2d 500, 503 (8th Cir.1987) (no single *Dataphase* factor dispositive; in each case all factors must be considered to determine if they weigh toward granting the injunction). With this standard and applicable guidelines in mind the parties respective positions shall be examined.

▮ The plaintiffs contend that the defendants violated sections 14(a) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C.A. Section 78n(a), (e), (1981). However, in their Brief in Support and their argument to the Court the plaintiffs asserted only their section 14(e) claim; therefore the Court presumes that the plaintiffs have abandoned their 14(a) claim regarding alleged violations of the proxy rules, and shall address solely their section 14(e) claim.

Section 14(e) states:

(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonable designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) the Supreme Court defined a material fact as one in which:

There is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . .

What the standard contemplate[s] is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

In order to demonstrate a violation of section 14(e) the party shouldering the burden of proof must show that the opposing party acted with scienter, *i.e.*, intent. *See, e.g. Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2nd Cir.1987) (scienter needed for damages claim under Section 14(e)); *SEC v. Texas International Company* 498 F.Supp. 1231, 1252 (N.D.Ill. 1980) (section 14(e) requires scienter element). Although some question exists as to whether a scienter element applies to this situation where the allegations go to false or misleading information, *see L. LOSS, Fundamentals of Securities* Regulations, p. 590 (1983) (scienter should be required for the fraud/deception clause of section 14(e) (which tracts section 17(a)(1) of the 1933 Act), but not for the untrue statements clause of section 14(e) (which tracts section 17(a)(2) precisely), the parties to this action concur in the applicability of the scienter element; therefore, their arguments shall be examined in light of it.

▮ Plaintiffs claim that the defendants news' releases of January 19, and 20, 1989, violated section 14(e). It has been established that on January 19, 1989, Tyson vice-president Bob Justice contacted the television station KHOG in Fayeteville, Arkansas, and informed anchor-woman Susan Rodman that Tyson had acquired Holly Farms during the early morning hours of January 19, 1989. Rodman broadcast this information on the 7:25 and 8:25 KHOG newscasts in Fayetteville, Arkansas. Her story was eventually picked up by several newswire services and appeared on the Dow Jones wire service at approximately 12:41 p.m. (eastern time) on January 19,

1989. Aside from stating that Tyson had increased its bid to $63.00 per share, an admittedly incorrect fact but not one on which the plaintiffs claim a violation, Justice could provide few details about the alleged acquisition. In his deposition, Justice stated that he had received the information concerning the purported Holly deal from another Tyson official, Buddy Wray, who in turn had received the information from Don Tyson in New York. Justice had no other factual basis for the statements he made to anchorwoman Susan Rodman. Later in the day, just after the noon hour, contact between Rodman and Justice was reestablished and Justice informed her that the purported Tyson–Holly Farms deal had hit a snag. Rodman broadcast this information on KOHG's 5:00 newscast, and later on the 6:00 report.

Plaintiffs argue that Justice's statements violated section 14(e) in that they were admittedly false, Tyson and Holly had no deal, and that Tyson could not have believed them to be true because no deal had been struck and it had never received word from the Holly Board regarding its proposal. In addition, plaintiffs contend that the announcement had a dramatic effect on the market for Holly's shares, boosting tremendously the trade in those shares. In response, the defendant contends that scienter has not been established in regard to Justice's statements in that no evidence appears suggesting that Justice had any reason to doubt or question the information relayed from Don Tyson that morning.

No question exists concerning the materiality of this fact; the stock market reaction confirms this conclusion. There is also no doubt that Justice's report was factually incorrect, no deal had been struck between Tyson and Holly Farms. But falsity alone does not establish a violation of section 14(e); scienter, too, is required. There does not appear to be evidence in the record which establishes that Justice or Tyson acted with the requisite intent to present false or misleading information to establish a section 14(e) violation. In her deposition anchorwoman Susan Rodman testified that she did not doubt Justice's statement that when he relayed the origi-

nal story that, to the best of his knowledge, he thought it was correct. In addition, Rodman testified that she had previously found Justice to be reliable and trustworthy in their dealings. (*See* Rodman Dep., p. 50). That leaves Mr. Tyson for scrutiny. From the record little is known about Tyson other than that he certainly participated in the negotiations with the Holly Board on the evening of January 18th into the morning hours of January 19th. It is also mentioned that he demonstrated a desire to shake hands with the Holly Board at 4 a.m. on the morning of January 19, 1989, but whether he ever did so is open to question. At that time it has been effectively demonstrated that Tyson and Holly Farms had come to agreeable terms regarding the "economics" of the Tyson proposal; its form or structure was supposed to be worked out between Tyson's and Holly Farms' legal counsel between 4 a.m. and 8 a.m. on the morning of January 19, 1989. This admittedly was never done and scuttled the negotiations between Tyson and Holly Farms. But the significant point is that when Mr. Tyson called Arkansas and spoke with Buddy Wray he apparently thought, based on the agreeable economics, that a deal had been won. It does not appear that in connection with the news story of January 19, 1989, that the plaintiffs have persuasively demonstrated that the defendants acted with the requisite scienter to establish a violation of Section 14(e). Therefore, it does not appear that the plaintiffs have a probability of success on the merits in regard to this particular issue. The news release issued on January 20, 1989, however, presents a completely different set of facts; one on which it appears that the plaintiffs will probably prevail.

On January 20, 1989, at approximately 10:00 a.m. (11:00 a.m. eastern time) Tyson vice president Bob Justice issued a news release from Tyson's headquarters in Arkansas. (See exhibit 11, Schell Dep.). Although Justice issued the news release it has been clearly established that he had no role in formulating or composing it; that part belonged to Michael Schell, Tyson's

New York counsel. Deposition testimony establishes that Schell telephonically dictated the news release from New York to Justice's secretary in Arkansas late in the afternoon on January 19, 1989. (Schell Dep., 82–84). At that time Schell knew that the Holly Board had not acted to accept or recommend the Tyson proposal. On the morning of January 20, 1989, Schell again spoke with Justice and his secretary, adding an additional sentence to the previously dictated release. (Schell Dep. 91). Again, as the point man for the Tyson negotiating team in New York, Schell knew that the Holly Board had not acted to accept or recommend the Tyson proposal. Shortly thereafter Justice released the Tyson news report which appeared on the Dow Jones wire service at approximately 11:19 a.m. (eastern time). (See exhibit 12, Schell Dep.). Contemporaneously with the issuance of this release, Schell and his colleagues were composing a demand letter to the Holly Farms' Board stating that Tyson could not "understand your (Holly Board's) continued refusal to accept Tyson's proposal" and demanding that the Holly Board "fulfill [its] fiduciary obligation and act in the best interests of [its] shareholders by accepting the Tyson bid forthwith." (exhibit 2, Schell Dep.). On January 20, 1989, the trade in Holly Farms' shares again crested its previous daily average. Trade in Holly shares for January 19 and 20 involved approximately 1.8 million shares. By January 23, 1989, tenders of Holly Farms' stock to Tyson had risen from approximately 1.25 million shares to approximately 5 million shares. On January 24, 1989, approximately 3.7 million shares of Holly stock which had been tendered to Tyson were withdrawn. (See exhibit 3 to Blecha Affidavit).

Based on these facts the plaintiffs argue that the defendants violated Section 14(e) by disseminating false and misleading information regarding the Tyson–Holly "deal", information which had a significant impact on market trade in Holly shares to the detriment of the plaintiffs' Merger Agreement with Holly which must be approved by ⅔'s of the outstanding Holly shares. Plaintiffs contend that Tyson knew that it had no deal with Holly when it issued the January 20, 1989, release, therefore the release was false. In arguing the scienter element plaintiffs focus on several facts: a) that Tyson and its advisors knew no deal had been struck with Holly, a fact Tyson's counsel knew because of his participation in the unsuccessful negotiations held during the morning hours between 4 a.m. and 8 a.m. on January 19, 1989; b) that Schell edited portions of a proposed joint draft press release produced by Holly's counsel, Michael Goroff, which specifically stated that "Holly Farms is unable at this time to enter into a definitive agreement with Tyson providing for $63.50 per share transaction" (Exhibit 8, McDonald Dep.); and c) that on the morning of January 20, 1989, contemporaneously with the issuance of the new release, Schell was writing a letter to the Holly Board demanding that it accept the Tyson proposal. Plaintiffs contend that these factors demonstrate that the defendants possessed the requisite scienter to establish a Section 14(e) violation.

In response, the defendants concentrate on the scienter argument stating that the evidence simply will not support a finding of intent to defraud. The defendants contend that the disclosure of January 20, was "scrupulously accurate" (Defendant's Brief, 27) and that Tyson, in fact, issued a clarifying new release to correct what it perceived as an erroneous, confusing Dow Jones wire service headline which stated that "Tyson Foods Says Holly Farms Board to Back $63.50—Share Offer." (See exhibits 14, 12 to Schell Dep.).

■ The crucial language in Tyson's January 20 press release is the following "Tyson said that it had been informed that Holly's financial advisor told its board that the proposal was fair and that the board is considering the proposal. Tyson said that it was advised that the Holly Board would recommend the Tyson proposal to Holly shareholders and would immediately redeem Holly Farm's poison pill rights plan. Tyson said that it has been waiting for a response since 8:00 a.m. yesterday morning." Under the totality of the circum-

stances known at the time the Court concludes that this news release was not an accurate one, that it was false and misleading, that it significantly impacted the trade in Holly Farms' stock, and that the release was issued with the requisite scienter to establish a Section 14(e) violation. The crucial factor in the Court's consideration of the January 20, 1989, news release is the pivotal role played by Michael Schell, Tyson's New York counsel. Schell participated in the negotiations of January 18th and 19th with the Holly Board and in the 4 a.m. to 8 a.m. negotiation session with Holly's counsel in an attempt to forge an agreeable structure to house and deliver the agreeable Tyson economic proposals. Schell knew that this effort had failed when the Holly Board reconvened at approximately 8:30 a.m. on January 19, 1989. In fact, Schell had edited a draft press release framed by Holly counsel which specifically stated that no definitive agreement had been reached by Tyson and Holly. A comparison of the substantive content and the language utilized in that draft with the substance and language of Tyson's January 20th news release demonstrates just how wide of the mark the Tyson release strayed. (See and Compare McDonald Dep., exhibit 8; Schell Dep., exhibit 11).

Michael Goroff's draft release specifically states that no definitive agreement had been reached between Tyson and Holly; this information, well known to Schell, was completely left out of Tyson's January 20 release. The significant difference between the draft and Tyson's news release is the failure of Tyson's release to convey the contingent nature of Tyson's dealings with the Holly Board, whose actions and recommendations presupposed action by Tyson in amending its offer prior to action by the Holly Board in recommending that proposal. Instead, the Tyson release skips this vitally important step. A reading of the release as a whole does not nearly nor accurately convey the events upon which it relies. The release also fails to give light to the contingent nature of Holly's financial adviser's recommendation about the Tyson offer. Finally, it is interesting to note that the Dow Jones wire service, presumably an organization with at least a modicium of experience in the investment world, gleaned just the type of meaning from this release [*i.e.*, that the Holly Board backed the Tyson proposal] which Tyson argues was not conveyed. Based on these factors, and the knowledge which Schell demonstrably possessed at the time he dictated this news release, knowledge which combined with the action of writing a demand letter to the Holly Board while this release was being issued, it appears that all of the elements (falsity, materiality, and scienter) necessary to establish a section 14(e) violation have been met. Therefore, the plaintiffs have established a probability of success on the merits on this particular issue.

ConAgra argues that absent a preliminary injunction it will suffer irreparable harm because additional false or misleading press releases and information will erode the Holly Farms shareholder base necessary to approval of the ConAgra–Holly Farms Merger Agreement, which must be approved by ⅔'s of the outstanding shares of each company. ConAgra argues that the false reports which spur market trading increase the pool of shareholders less likely to look beneficially upon the tax deferment aspects of the Merger Agreement (which envisions a stock swap of 1.875–2.0 shares of ConAgra stock for 1 share of Holly stock) an aspect more attractive to a long-term as opposed to a short-term shareholder. At the February 14, 1989, hearing the defendants stated that approximately 5 million Holly shares have currently been tendered to Tyson. Approximately 6.1 million shares are necessary to block the ConAgra–Holly Merger Agreement. In response, Tyson argues that no connection exists between ConAgra's alleged harm and the defendants' actions. This argument is based on evidence that 50% of Holly's shareholders are not sensitive to the tax aspects of the ConAgra–Holly Merger Agreement, and that after Tyson's disclosure most of the trading activity of January 19th and 20th, involved arbitrageurs rather than long-term shareholders of Holly. *See Wellman v. Dickin-*

son, 497 F.Supp. 824, 836 (S.D.N.Y.1980) aff'd 682 F.2d 355 (2nd Cir.1982) cert denied, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983) (without a connection between the violation and the injury, no actionable wrong has occurred). Additionally, Tyson argues that it, rather than ConAgra, would suffer harm because of the public perception generated by issuance of a preliminary injunction against it.

Whether ConAgra will suffer irreparable harm if Tyson is not enjoined is a close issue because of the facts involved. The ConAgra–Holly Merger Agreement lives or dies depending upon ⅔'s approval of each company's shareholders. Although the evidence demonstrates that 50% of the Holly shareholders are not sensitive to the tax aspects of the Merger Agreement, this certainly does not mean, as the defendant implicitly argues, that that 50% would automatically prefer the higher price offered by Tyson's proposal. Undoubtedly many factors play a role in investor decisions, tax issues being but one. Therefore, it cannot be said, logically or otherwise, that no connection exists between Tyson's probable violation and irreparable harm to ConAgra. Clearly a causal link existed between Tyson's statements and the tremendous jump in market trade of Holly shares, which certainly altered in some manner the position of the Merger Agreement's success. The Court is not finding, however, that ConAgra has been harmed by the tenders made to Tyson due to its statements because the evidence demonstrates that a number almost equal to those tendered on January 23 were withdrawn on January 24, presumably when accurate information on Tyson's proposal reached investors. (See Blecha Affidavit, exhibit 3).

On balance, however, and in light of the particular circumstances of this action ConAgra has demonstrated that it will suffer irreparable harm if Tyson is not enjoined. The Court recognizes that the purpose of the securities disclosure statutes is to provide full and fair disclosure for the benefit of investors, and that once that goal is accomplished additional injunctive relief is usually not warranted, absent evidence suggestive of recurrent violations. Ron-

deau v. Mosinee Paper Company, 422 U.S. 49, 52, 95 S.Ct. 2069, 2073, 45 L.Ed.2d 12 (1975). The Court remains mindful, though, of the flexible approach adopted by the Eighth Circuit in determining whether a preliminary injunction should be granted. In Chromalloy American Corporation v. Sun Chemical Corporation, 611 F.2d 240, 249 (8th Cir.1979) in a securities action, the Eighth Circuit stated that "relief beyond compliance with the reporting [in this action, disclosure] requirements is justified only if the petition can show irreparable harm in the absence of such relief." Id. (emphasis added). Although it is certain that nobody thinks that Tyson and Holly Farms have struck a deal, that information having been disclosed, a threat of irreparable harm still exists to ConAgra. As stated, the ConAgra–Holly Merger Agreement becomes effective on ⅔'s approval of each company's shareholders. Due to the volatility of market activity in the wake of inaccurate or misleading disclosures, another Tyson transgression could irreparably hamper ConAgra's efforts at obtaining a fair chance for shareholder approval of the Merger Agreement. This is especially so now that it appears the vote will be a close one. Therefore, in light of these factors and in the exercise of its discretion the Court concludes that ConAgra will be irreparably harmed if a preliminary injunction is not issued.

The Court is not persuaded that Tyson will suffer damage if the injunction issues in a degree greater than ConAgra will suffer if is not. Although adverse publicity may be generated, Tyson can counter it with its own accurate publicity. Finally, the public interest shall be served by issuing a preliminary injunction because investors will have the benefit of accurate information and will be able to make their investment decisions on that basis.

In summary, on the plaintiffs' motion for preliminary injunctive relief, weighed in light of the Dataphase elements, the Court concludes as follows: a) that a threat of irreparable harm does exist for ConAgra; b) the balance of the harm to ConAgra and the injury to Tyson from the grant of the

injunction weigh in favor of ConAgra; Tyson's injury will be a publicly perceived one which, although certainly a harm, can be overborne by Tyson's accurate public disclosures; c) it appears that ConAgra has a fair probability of success on the merits of its 14(e) claim regarding the January 20, 1989, news release; and d) the public interest in insuring that accurate complete information is provided to investors will be served. Therefore, the Court shall enter a preliminary injunction for the plaintiffs and against the defendants as detailed in the Order at the end of this Memorandum.

The Court shall now address the defendants' counterclaim in which Tyson alleges that plaintiffs violated sections 14(a) and 14(e) of the Securities Act of 1934, 15 U.S.C. Section 78n(a), (e) when they issued a January 24, 1989, press release concerning this litigation. (*See* exhibit 1, Casey Dep.). In its section 14(a) claim Tyson alleges that ConAgra's news release constitutes a proxy solicitation in violation of the securities laws in that ConAgra has not furnished the persons solicited, *i.e.,* Holly shareholders, with a written proxy statement containing legally prescribed information and that ConAgra's alleged intentional violation of the federal securities law and regulations causes harm to shareholders by depriving them of information necessary for informed investment decisions in choosing between the Tyson and ConAgra proposals. Tyson relies on section 14(a) and Rule 14a–3 for support of its claim and seeks appropriate preliminary injunctive relief.

ConAgra responds to this argument by arguing that its January 24, 1989, press release was not in fact a solicitation of a proxy, therefore, since a solicitation is a requisite element of a section 14(a) violation, no violation can be demonstrated in the instant action. ConAgra contends that a communication to the general public contemporaneously with a significant corporate event, prior to the scheduling of any shareholder meeting, does not constitute a proxy solicitation. In support ConAgra cites *Brown v. Chicago Rock Island Company,* 328 F.2d 122 (7th Cir.1964) where the court concluded that an advertisement published in a number of newspapers did not constitute a proxy solicitation but that the purpose of the advertisement was to inform and motivate the public. Under the prevailing circumstances, the court concluded that there was "nothing in the record to substantiate the conclusion that it was a 'communication reasonably calculated to result in the procurement' of proxies." *Id.* at 125. ConAgra also cites *Smallwood v. Pearl Brewing Company,* 489 F.2d 579, 600–601 (5th Cir.1974) in support of its argument that its press release did not constitute a proxy solicitation. Relying upon these precedents ConAgra contends that its press release did not constitute a solicitation of proxies for the following reasons: a) its purpose was to inform the public about a significant corporate development; b) that at the time of issuance no shareholders meeting has been scheduled by either ConAgra or Holly to vote on the Merger; and c) that proxies were not mentioned in the press release.

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. Section 78n(a) states:

(a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

Rule 14a–3 states:

(a) No solicitation subject to the regulation shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A (Section 240.14a–101) or with written proxy statement included in a registration statement filed under the Securities Act of 1933 on Form S–4 or F–4 (Section 239.25 or Sec-

tion 239.34 of this chapter) or Form N–14 (Section 239.23) and containing the information specified in such Form.

Under the rules, solicitation includes "(i) any request for a proxy whether or not accompanied by or included in a form of proxy; (ii) any request to execute or not to execute, or to revoke, a proxy; or (iii) the furnishing of a form of proxy or *other communication* to security holders under circumstances reasonably calculated to result in procurement, withholding or revocation of a proxy." *See* 17 C.F.R. Section 240.14a–1(j)(i), (iii). Solicitation materials can take the form of press releases. 17 C.F.R. Section 240.14a–6(h). In *Long Island Lighting Company v. Barbash*, 779 F.2d 793 (2nd Cir.1985) the Second Circuit stated that the proxy rules applied "not only to direct requests to furnish, revoke or withhold proxies, but also to communications which may indirectly accomplish such a result or constitute a step in a chain of communications designed ultimately to accomplish such a step." *Id.* at 796. Furthermore, the court stated that the "question in every case is whether the challenged communication, seen in the totality of the circumstances, is 'reasonably calculated' to influence the shareholders' votes." *Id., quoting Trans World Corporation v. Odessey Partners*, 561 F.Supp. 1311, 1320 (S.D.N.Y.1983). In *SEC v. Okin* 132 F.2d 784, 786 (2nd Cir.1943) an often cited Second Circuit decision in which the court examined the solicitation of proxies within Section 12(e) of the Public Utilities Holding Company Act, 15 U.S.C.A. Section 79*l* (e) (a statute similar to the statute at issue), the court concluded that the proxy rules extended to any "writings which are part of a continuous plan ending in solicitation [of proxies] and which prepare the way for its success." *Id.*

█ Based on the circumstances of this action the Court finds that Tyson has established a reasonable probability of success on the merits that the plaintiffs, through the use of their press release, violated the proxy solicitation rules embodied in section 14(a), 15 U.S.C.A. 78n(a), and Rule 14a–3, 17 C.F.R. Section 240.14a–3. At the time of the January 24, 1989, press

release statement the time for proxy solicitation was close indeed. In fact, at the temporary restraining order hearing plaintiffs' counsel indicated that proxy material was being prepared for mailing to both ConAgra and Holly Farms' shareholders. At the most recent hearing plaintiffs' counsel again intimated that the time for sending proxy material was close at hand and that a shareholder meeting for ConAgra and Holly had been scheduled for late March, 1989. It is clear that proxy solicitations neither have to contain the word proxy within them nor be a direct solicitation of a proxy; indirect methods of solicitation are also covered by the statutes. *See Long Island Lighting, supra* at 796. Rather, the weighing of the circumstances surrounding the alleged solicitation is the important issue; as plaintiffs note whether or not a communication is a solicitation within the meaning of Section 14(a) is a question of fact depending on the nature of the communication and the circumstances under which it was transmitted. In its January 24, 1989, press release the plaintiffs stated, in part, that the "Holly Farms' financial advisors placed real values exceeding $64 per share to Holly Farms shareholders."

At the time this press release issued the plaintiffs and defendants were, and still are, engaged in a vigorous contest for corporate control of Holly Farms Corporation. Recently, defendants had made a highly publicized $63.50 per share conditional proposal for purchase of Holly Farms' shares. Plaintiffs hope of acquiring Holly Farms rests upon a previously negotiated Merger Agreement with Holly Farms which requires approval of ⅔'s of each company's shareholders. In light of these factors, and the fact that ConAgra's "real value exceeding $64 per [Holly] share" came so quickly upon the heels of Tyson's highly publicized $63.50 proposal, the Court concludes that ConAgra, in all probability, issued this press release with the hope of soliciting proxy votes in favor of the ConAgra–Holly Merger Agreement. This conclusion is additionally supported by the fact that at the time of this press release ConA-

gra was in the process of assembling proxy materials to be sent to shareholders. Therefore, the Court concludes that Tyson has demonstrated that it will probably succeed on the merits on this particular claim.

■ Next, the defendants contend that ConAgra's press release was false and misleading in violation of section 14(e) of the 1934 Act, 15 U.S.C.A. Section 78n(e). Again the relevant elements are whether the statement is false or misleading, whether the statement is or omits a material fact, and whether ConAgra acted with scienter.

The nub of Tyson's argument is that ConAgra's statement that Holly's financial advisors's had placed "real value" exceeding $64 per share on the ConAgra merger proposal is false and misleading. Defendants argue that this statement was demonstrably false and was intended only to mislead Holly shareholders into thinking that the ConAgra proposal offered a higher economic value than did the Tyson proposal. In response ConAgra argues that its statement regarding the "real value" of its Merger Agreement exceeding $64 per share of Holly stock was merely a description of the facts of the lawsuit filed against Tyson on that very day. Additionally, ConAgra argues that even if the statement is deemed as fact, as opposed to opinion, the statement is neither false nor misleading. In support ConAgra relies upon the deposition testimony of Lee Taylor, President of Holly Farms, to substantiate its $64 "real value" statement.

Once again the Court concludes that the defendants have demonstrated a sufficient probability of success on the merits. The following factors underlie this conclusion. ConAgra's statement that the "Holly Farms' financial advisors placed real values exceeding $64 per share to Holly Farms' shareholders" is based upon a November, 1988, deposition by Lee Taylor, Holly's president. Between then and January 24, 1989, the date of ConAgra's news release many events and activities transpired which appreciably altered the circumstances surrounding the battle for Holly Farms. Tyson had made a highly publicized $63.50 conditional proposal for Holly. In the Court's view it seems more than coincidental that ConAgra would cite in its press release a figure exceeding $64 of "real value", a figure greater than the well publicized $63.50 price offered by Tyson. ConAgra could not have credibly issued this release without misleading the Tyson shareholders and without further indicating the basis of its statement, especially since the Holly financial advisors, Morgan Stanley, had indicated that if the $63.50 Tyson proposal were deliverable then it represented the higher economic value than the ConAgra proposal did. Although in his February 7, 1989, deposition Holly financial advisor, Stephen Waters, indicated that the ConAgra offer might be the better one in the long run, due to the time factor ConAgra could not and did not rely upon this opinion in issuing its news release regarding the $64 real value of its Merger Agreement with Holly. Again, the circumstances are just too coincidental to conclude other than that ConAgra took unwarranted liberties with the facts to enhance the appearance of its Merger Agreement, thus probably violating Section 14(e). Nor is the Court persuaded by ConAgra's argument that the news release merely reflects the Complaint filed in this action. The statement made appears in the news release as one of fact not one of opinion or allegation. The Complaint in this action alleged that Tyson had violated securities laws with its January 19 and 20th news releases. ConAgra should not be permitted to include facts either unrelated or only tangentially related to the allegations in its Complaint and then cite these facts in a news release which ostensibly reports on the Complaint itself. This tactic, in the Court's view, would exult from over substance in regard to securities regulations and shall not be adopted by the Court.

On the remaining *Dataphase* elements the Court concludes that Tyson will suffer irreparable harm if a preliminary injunction does not issue. Tyson's opportunity to compete for the acquisition of Holly Farms will be damaged if ConAgra's probable violations of federal securities laws are left unchecked. Nor is the Court persuaded that ConAgra will suffer a vastly greater

harm if injunctive relief is granted than Tyson if injunctive relief is withheld. ConAgra need only comply with its disclosure obligations under federal law. Finally, the public interest will be served by issuance of a preliminary injunction. Holly Farms' shareholders and the investing community in general will receive accurate information upon which to weigh the competing offers for Holly Farms, thus achieving the primary goal behind these securities regulations. Therefore, the Court concludes that a preliminary injunction shall issue against ConAgra as detailed in the Court's Order.

Finally, the Court notes that neither of these parties deserve undue advantage over the other. Each is entitled to a fair shot at acquiring Holly Farms, that's a shareholder decision. Neither party appears to have been vigilant in their observation of the securities laws. Both shall now, as nearly as possible, be put back on level ground to pursue their contest shorn of the undue advantages, if any, generated by their previous questionable conduct.

Therefore, based on the reasons stated in this Memorandum, plaintiffs' motion for a preliminary injunction shall be granted and an injunction issue against defendants who are enjoined from disseminating or issuing either, directly or indirectly, any information which is false, misleading, inaccurate, or incomplete in regard to a) any of the terms or conditions of any Tyson proposal or offer to acquire Holly Farms; b) any of the terms or conditions of the ConAgra–Holly Merger Agreement; or c) any of the legal positions, rights, or responsibilities of either ConAgra or Holly Farms. As with the temporary restraining order previously issued, this preliminary injunction is of limited scope, requiring only that the defendants exercise circumspection regarding its obligations under federal securities laws. This preliminary injunction shall become effective upon plaintiffs filing of a twenty-five thousand ($25,000.00) dollar surety bond with the Clerk of the United States District Court for the District of Nebraska. *See* Rule 65(c), Fed.R.Civ.P.

In addition, based on the reasons stated in this Memorandum, defendants' cross-claim and motion for preliminary injunction shall be granted. Plaintiffs are enjoined from issuing or disseminating, either directly or indirectly, any false, misleading, or inaccurate statement regarding any of the proposed transactions or agreements between Tyson and Holly Farms or ConAgra and Holly Farms. Plaintiffs are also enjoined from further soliciting any proxies with respect to either ConAgra or Holly shareholders, either directly or indirectly, without first complying with the applicable requirements of section 14(a) and its appropriate regulations. This preliminary injunction is of a limited scope requiring only that the plaintiffs observe and comply with the applicable securities regulations. This preliminary injunction shall take effect upon the defendants filing of a twenty-five thousand ($25,000.00) dollar surety bond with the Clerk of the United States District Court for the District of Nebraska. *See* Rule 65(c), Fed.R.Civ.P.

IT IS SO ORDERED.